IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 15, 2003

## STATE OF TENNESSEE v. PAUL GRAHAM MANNING

**Appeal from the Criminal Court for DeKalb County**
**No. 98-89     Leon Burns, Judge**

-----------

**No. M2002-00547-CCA-R3-CD - Filed February 14, 2003**

-----------

The Defendant, Paul Graham Manning, was convicted by a jury of first degree premeditated murder and felony reckless endangerment. In this direct appeal, the Defendant raises six issues: (1) whether the evidence is sufficient to support his convictions; (2) whether the trial court properly instructed the jury on lesser-included offenses; (3) whether the trial court properly instructed the jury on the culpable mental state required for premeditated murder; (4) whether the Defendant was denied his constitutional right to a speedy trial; (5) whether the trial court erred by not reducing his bond; and (6) whether the trial court erred in quashing the Defendant's subpoena for certain witnesses. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Terry D. Dycus and John Nisbett, Assistant Public Defenders, Cookeville, Tennessee, for the Appellant, Paul Graham Manning.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; William E. Gibson, District Attorney General; and Ben Fann and William Locke, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

On the night of December 15, 1997, the Defendant and his wife, Jackie Manning, attended a basketball game in which their son, fourteen-year-old Josh Manning, was playing. On their way home, the Defendant stopped at a liquor store and purchased a fifth of whiskey. According to Josh, the Defendant began drinking the liquor as soon as he returned to the car.

When the family got home, Josh went to his room and eventually to bed. He was awakened later by the sounds of his parents arguing. Josh testified that he heard the Defendant say something

about getting a gun. Josh then heard his father go to the closet where he kept his shotgun. Alarmed, Josh got up and went into the living room. He saw his father seated on the couch with the shotgun nearby; his mother was standing at the front door to the house, directly across from the couch. Josh testified that the Defendant was accusing his wife of infidelity and calling her vulgar names. Josh began arguing with the Defendant, telling him to leave his mother alone. Josh told the Defendant that "he thought he was big and bad because he had a gun." In response to this taunt, the Defendant fired the shotgun over Josh's head, striking the wall. A pellet from the blast grazed Josh's cheek. The Defendant then stated, "That proves my point."

Following the shot Mrs. Manning stated, "I can't take this anymore" and began to turn to leave the house. According to Josh, the Defendant responded by saying, "If you move another inch, I'll blow your head off." As Mrs. Manning continued her attempt to leave the house, the Defendant fired the gun again. Mrs. Manning fled outside, and Josh ran out to check on her. Josh found his mother lying on the ground with a gunshot wound to her torso.

Josh returned to the house to call 911. He found the Defendant in the Defendant's bedroom gathering more shotgun shells. Josh begged the Defendant not to get any more shells, and the Defendant eventually dropped the ones he already had in his hand. Josh called 911. While Josh was speaking with the dispatcher, the Defendant yanked on the phone wires leading to the wall jack, disconnecting the call.

Josh told the Defendant that he (the Defendant) had shot the victim and that he (Josh) had to call 911. Josh took the gun from the Defendant, and the Defendant went outside. Josh hid the shotgun under his bed and again called 911 on the cordless headset of the phone. Josh told the 911 dispatcher that his father had shot his mother, but he said that the shooting had been accidental. At trial, Josh explained that this report was not true, but that he was afraid to report the shooting as deliberate. He subsequently told investigating officer Billy Miller that the shooting had not been accidental, and he reiterated this at trial.

Josh returned to his mother and found the Defendant with her. Josh testified that he heard the Defendant say, "Oh, my God. What have I done? Help, help; somebody help. I'm sorry; I'm sorry." Josh testified that he "guess[ed]" his father was drunk that night, and he further testified that the Defendant did not initially realize that he had shot his wife. When Josh found the Defendant with Mrs. Manning, the Defendant was applying pressure to the gunshot wound and was crying and upset. The Defendant told Josh at that point to call 911.

Officer Miller testified that when he arrived on the scene, the Defendant was crouched over Mrs. Manning, saying "I'm sorry" and "help her." Josh told Officer Miller that the Defendant had shot at him and then shot his mother. Josh showed Officer Miller where he had hidden the gun, and Officer Miller confiscated the weapon, a 12 gauge shotgun. Officer Miller also recovered from the living room three shotgun shells and two empty shell cartridges. He took photographs of the hole in the wall occasioned by the Defendant shooting over Josh's head. Officer Miller testified that the Defendant was "combative and upset" at the scene but did not appear drunk. Officer Miller stated that the Defendant appeared to know what was going on.

After the Defendant was taken into custody, he gave a short statement to Officer Miller. According to Officer Miller, the Defendant told him that he had been asleep that night and "heard a pop. He got up, walked outside and saw his wife, Jackie, laying in the driveway and stayed there with her until somebody came. He didn't know who they was, who it was that responded, and he said at that point in time he did not remember anything else." The Defendant told Officer Miller nothing else about the incident.

Officer Miller performed a gunshot residue test on the Defendant, but this occurred fifteen or sixteen hours after the shooting. TBI forensic scientist James Russell Davis II testified that the test results were "inconclusive," but he explained that the length of time between the gun being fired and the test being performed was "very important." He testified that a long-barreled gun also reduced the chances of the test being positive.

TBI forensic scientist Donald I. Carman testified that the empty shell casings recovered from the scene had been fired from the shotgun recovered from the scene.

Dr. Charles W. Harlan performed the autopsy on the victim and testified that she died as the result of a shotgun wound to her abdomen. Dr. Harlan recovered multiple shotgun pellets from the victim's body. He testified that the distance from the shotgun to the victim at the time of firing was probably four to six feet, more probably six feet.

Cindy Krupp, the 911 dispatcher who took Josh's calls, testified that the first call came in at about 11:55 p.m. on December 15, 1997. She explained that a boy stated that his mother had been shot and they needed an ambulance. During the call, the phone went dead; however, the caller called back "seconds later." Ms. Krupp confirmed that the caller had described the shooting to her as accidental.

Stephanie Lee, the victim's daughter, testified that her mother and the Defendant began living together when she was in the third grade. She stated that there was a lot of arguing, that the Defendant was "very, very, very jealous," and repeatedly accused the victim of cheating on him and lying to him. Ms. Lee testified that it was common for the Defendant to tell the victim, "If you ever leave me, I'll kill you." Ms. Lee explained that she left the couple when she was thirteen or fourteen to go live with her father. She explained that she left to avoid the constant fighting between her mother and the Defendant.

The Defendant testified that he did not know how his wife came to be shot. He explained that he "woke up" beside her on the ground in the driveway. He stated that he "rolled over and put [his] arm around her and when [he] did that [he] felt the wound." He explained that he "held the wound" and that it was "devastating" to him: "the most traumatic moment in [his] whole life." He testified that the last thing he remembered before waking up was setting his drink on the night stand. He explained that, while Josh was making the second 911 call, he "was in a mental state that [he] couldn't hardly keep conscious. It was all [he] could do to keep [his] mind. [He] kept going in and out conscious, like [he] was drugged or something." With respect to Josh's testimony, the Defendant

testified, "I don't remember any incident that he's testified to. I don't have any recollection to that whatsoever." On cross-examination the Defendant stated that he "didn't pull the phone jack out" and that Josh was lying about that. He further stated that he "didn't get a gun that night."

The Defendant admitted on cross-examination that he wrote letters to Josh after his arrest that included the following statements:

If they prove that I didn't do it, you'll be the number one suspect.

And they'll come and get you and jail you for first degree murder and put you away for the rest of your life.

I have a lawyer who will come to see you and tell you exactly what to do.

I have not told the cops anything and even haven't told my lawyer all I know.

You may think all is well but I can assure you that you are in for some surprises if you don't listen to me.

I am your dad and I love you, but I won't take a 15 to 25 year sentence for you.

The Defendant denied that he was trying to get his son to admit to the killing, and he testified that he "was trying to get him to keep his mouth shut." The Defendant maintained his lack of recollection of the events surrounding his wife's death, but he stated that "I don't think I shot her at all." He claimed to have taken a "truth serum test" that indicated that, "if I did shoot my wife, it was probably an accident." No further evidence of this "test" was proffered. The Defendant also admitted on cross-examination that his statement to Officer Miller had been false.

## SUFFICIENCY OF THE EVIDENCE

In his first issue the Defendant contends that the evidence is not sufficient to support his convictions of first degree premeditated murder and felony reckless endangerment. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. See McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Buggs, 995 S.W.2d 102, 105-06 (Tenn. 1999); State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914; see also Smith, 24 S.W.3d at 279. The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191; see also Buggs, 995 S.W.2d at 105. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. See Tuggle, 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. See State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000); State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

First degree premeditated murder is defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself." Id. § 39-13-202(d). However,

> [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. Factors supporting a finding that the accused killed the victim with premeditation include declarations by the accused of an intent to kill, evidence of the accused's procurement of a weapon, and the use of a deadly weapon where the victim is unarmed. See State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000). The killing must be intentional as well as premeditated. "'Intentional' refers to a person who acts intentionally with respect to . . . a result of the [person's] conduct when it is the person's conscious objective or desire to . . . cause the result." Tenn. Code Ann. § 39-11-302(a).

The proof in this case established that the Defendant and the victim were arguing, and the Defendant decided to retrieve his shotgun from the closet. Josh testified that the Defendant kept this weapon loaded "at all times." The Defendant returned to the living room couch with the gun. When Josh taunted him about it, the Defendant fired the gun over Josh's head, grazing his son's face with one of the shotgun pellets. Obviously, the Defendant then knew that the gun was, indeed, loaded. When the victim then protested that she "[couldn't] take this anymore," the Defendant told her that if she moved another inch, he would "blow [her] head off." When the victim then attempted to leave the house, the Defendant followed through on his threat and fired the shotgun at her, hitting her in the abdominal area. The Defendant then walked into the bedroom, retrieved more shells for the gun, and violently disconnected Josh's call to 911.

This proof is more than sufficient to demonstrate that the Defendant killed the victim intentionally and with premeditation. This issue is, accordingly, without merit.

The Defendant also questions the sufficiency of the evidence supporting his conviction of felony reckless endangerment. Reckless endangerment is committed when the accused "recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103(a). If the conduct at issue is committed with a deadly weapon, the offense is felony reckless endangerment. See id. § 39-13-103(b). A person acts recklessly

> with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-302(c).

In this case, the Defendant fired a shotgun over Josh's head from just a few feet away, grazing the boy on the face with one of the shotgun pellets. Obviously, firing a shotgun over someone's head from a short distance away puts the person "in imminent danger of death or serious bodily injury" and is reckless conduct, at best. Indeed, during closing argument, defense counsel stated, "There's no doubt that drinking and weapons creates a reckless endangerment. No doubt. I'm not even going to argue that." We agree with trial counsel: the evidence is sufficient to support the Defendant's conviction of felony reckless endangerment, and this issue is therefore without merit.

## LESSER-INCLUDED OFFENSES

The trial judge instructed the jury on the following lesser-included offenses of first degree premeditated murder: second degree murder, voluntary manslaughter, reckless homicide and criminally negligent homicide. The jury returned a verdict of first degree premeditated murder. The Defendant now contends that the trial court committed reversible error by failing to charge as additional lesser-included offenses of first degree premeditated murder, the offenses of aggravated assault and assault. We respectfully disagree.

Trial courts are under a duty to "'instruct the jury on all lesser-included offenses if the evidence introduced at trial is legally sufficient to support a conviction for the lesser offense.'" State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999) (quoting State v. Langford, 994 S.W.2d 126, 128 (Tenn. 1999)). In Burns, our Supreme Court adopted a new three-part test for determining whether an offense is a lesser-included offense. See 6 S.W.3d at 466-67. Under the new test, which was largely derived from the Model Penal Code, an offense is a lesser-included offense if:

(a) all of its statutory elements are included within the statutory elements of the offense charged; or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing

      (1) a different mental state indicating a lesser kind of culpability; and/or

      (2) a less serious harm or risk of harm to the same person, property or public interest; or

(c) it consists of

      (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

      (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

      (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Id. The Defendant contends that aggravated assault and assault are lesser-included offenses of first degree premeditated murder under part (a) of the Burns test.

We agree. As set forth above, first degree premeditated murder is the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). An aggravated assault is committed, on the other hand, when the accused intentionally, knowingly, or recklessly causes serious bodily injury to another. See id. § 39-13-102(a)(1)(A), (a)(2)(A). Similarly, an assault is committed when one "[i]ntentionally, knowingly or recklessly causes bodily injury to another." Id. § 39-13-101(a)(1). The mens rea of intentional includes the mens reas of knowing and reckless. See id. § 39-11-301(a)(2). A killing certainly includes serious bodily injury (as well as "mere" bodily injury). Thus, all of the statutory elements of these forms of aggravated assault and assault are included within the statutory elements of first degree premeditated murder, and they are therefore lesser-included offenses under part (a) of the Burns test.[1] The trial court therefore erred when it failed to instruct the jury on these forms of aggravated assault and assault.

"An erroneous failure to give a lesser-included offense instruction will result in reversal unless a reviewing court concludes beyond a reasonable doubt that the error did not affect the outcome of the trial." State v. Allen, 69 S.W.3d 181, 189 (Tenn. 2002). In this case, the trial court instructed the jury on the lesser-included offenses of second degree murder, voluntary manslaughter,

---

[1]Aggravated assault and assault can also be committed in ways which would not meet the definition of a lesser-included offense of first degree premeditated murder under part (a) of Burns. For instance, an assault is committed when one "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." Tenn. Code Ann. § 39-13-101(a)(2). The statutory elements of first degree premeditated murder do not include the element of fear. Similarly, an aggravated assault is committed when the accused commits an assault with a deadly weapon. See id. § 39-13-102(a)(1)(B). The statutory elements of first degree premeditated murder do not include the use of a deadly weapon.

-7-

reckless homicide, and criminally negligent homicide. In spite of these choices, the jury returned a verdict finding the Defendant guilty of first degree premeditated murder. Where a jury rejects lesser-included offenses which occur higher on the lesser-included hierarchy than the challenged lesser-include offense, the failure to charge the challenged offense is harmless error beyond a reasonable doubt. See id. (noting that "the error may be harmless when the jury, by finding the defendant guilty of the highest offense to the exclusion of the immediately lesser offense, necessarily rejected all other lesser-included offenses.") (citing State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998)). Accordingly, the Defendant is entitled to no relief on this issue.

### JURY INSTRUCTION ON "INTENTIONAL"

The Defendant next contends that the trial court erred in its charge to the jury on the definition of "intentionally" as that term is used in the offense of first degree premeditated murder. In pertinent part, the trial court charged the jury that, in order to find the Defendant guilty of first degree premeditated murder, it had to determine that the Defendant "acted intentionally. A person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result[.]" The Defendant contends that the trial court committed reversible error by referring to "the nature of the conduct." The Defendant argues that, pursuant to this Court's decision in State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002), the trial court should have charged the jury as follows: "A person acts intentionally when it is the person's conscious objective or desire to cause the death of the alleged victim." Id. at 790 app. The State concedes that the trial court's instruction was erroneous, but maintains that the error is harmless beyond a reasonable doubt.

In Page, the defendant was convicted of second degree murder: the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). This Court reversed the Defendant's conviction because the trial court instructed the jury that a person acts "knowingly" if the person acts with an awareness: (1) that his conduct is of a particular nature; or (2) that a particular circumstance exists; or (3) that the conduct was reasonably certain to cause the result. See Page, 81 S.W.3d 786. Recognizing that second degree murder is a result-of-conduct crime, see State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000), this Court determined that "[t]he result of the conduct is the only conduct element of the offense; the 'nature of the conduct' that causes death is inconsequential." Page, 81 S.W.3d at 787. Because the jury charge permitted the jury to convict the defendant based upon his awareness of the nature of his conduct or upon the circumstances surrounding his conduct, the State's burden of proof was improperly lessened. See id. at 788. Applying a constitutional harmless error analysis, see id. at 789, this Court determined that the error required reversal because the defendant's mens rea was "the disputed issue at trial." Id.

This Court has previously considered the holding of Page in the context of a conviction for first degree premeditated murder. See State v. Antoinette Hill, No. E2001-02524-CCA-R3-CD, 2002 WL 31780718 (Tenn. Crim. App., Knoxville, Dec. 13, 2002). As set forth above, the mens rea requirement for this form of murder is premeditated and intentional. Our criminal code defines "intentional" as referring to a person "who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the

conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (emphasis added). However, first degree premeditated murder, like second degree murder, is a result-of-conduct offense. See State v. Antoinette Hill, 2002 WL 31780718, at *5. Therefore, with respect to first degree premeditated murder, the first of the two disjunctive definitions is irrelevant.

Thus, the jury instruction provided in this case contained an irrelevant definition. More importantly, the irrelevant definition given in this case was erroneous because it provided the jury an opportunity to convict the Defendant based only on his awareness of the nature of his conduct: an improper lessening of the State's burden of proof. See Page, 81 S.W.3d at 788. To be convicted of first degree premeditated murder, a defendant must be aware that his or her conduct is reasonably certain to cause death. See id.

Given that the trial court's instruction on the definition of intentional was erroneous, we must now determine whether that error was harmless beyond a reasonable doubt. We conclude that it was. As noted by this Court in Antoinette Hill, a conviction of first degree premeditated murder indicates that the jury necessarily concluded that the defendant "displayed a previously formed design or intent to kill." 2002 WL 31780718, at *5. As set forth above, the jury's conclusion in this regard is supported by sufficient evidence. Moreover, the Defendant's theory of defense in this case did not hinge on his mens rea, as did the theory of defense in Page. In Page, the defendant conceded that he had committed the killing. See 81 S.W.3d at 789. He contended, however, that he had been drunk when he hit the victim with a baseball bat, and he hadn't meant to hit the victim "that hard." Id. The Defendant in this case did not concede that he had committed the killing but claimed that he couldn't remember what had happened to his wife or how she came to be shot. Prior to trial, the Defendant tried to place the blame for the killing on his own son. In short, the Defendant's theory of defense was that he didn't think he shot the victim "at all," not that he shot her while in a drunken rage. In light of these factors, we hold that the trial court's erroneous instruction to the jury was harmless beyond a reasonable doubt, and this issue is therefore without merit.

The Defendant makes the same argument with respect to the trial court's instruction on the "knowing" element of the lesser-included offense of second degree murder. Because the Defendant was not convicted of this offense, this issue is moot and we will not address it.

**SPEEDY TRIAL**

In his fourth issue, the Defendant complains that he was denied his constitutional rights to a speedy trial. He points out that he was arrested in 1997 but not brought to trial until 2001.

A criminal defendant is guaranteed the right to a speedy trial by our federal and state constitutions and by state statute. See U.S. const. amend. VI; Tenn. const. art. 1, § 9; Tenn. Code Ann. § 40-14-101. See also Tenn. R. Crim. P. 48(b). The right to a speedy trial protects the accused from oppressive pretrial incarceration, anxiety and concern arising from unresolved criminal charges, and the possibility that the accused's defense will be impaired by fading memories and the loss of

exculpatory evidence.  See Doggett v. United States, 505 U.S. 647, 654 (1992); State v. Simmons, 54 S.W.3d 755, 758 (Tenn. 2001).  "The right to a speedy trial attaches at the time of arrest or indictment, whichever comes first, and continues until the date of the trial."  State v. Vickers, 985 S.W.2d 1, 5 (Tenn. Crim. App. 1997).  In determining whether a defendant's right to a speedy trial has been compromised, four factors must be weighed:  the length of the delay, the reason for the delay, the defendant's assertion of his right to a speedy trial, and any prejudice to the defendant caused by the delay.  See Barker v. Wingo, 407 U.S. 514, 530 (1972); State v. Bishop, 493 S.W.2d 81, 83-85 (Tenn. 1973).  The most important of these factors is whether the defendant was prejudiced by the delay, and the most important issue concerning prejudice to the defendant is whether his or her ability to prepare a defense was impaired.  See Barker, 407 U.S. at 532.  To trigger the Barker analysis, the interval between accusation and trial must be "presumptively prejudicial." Doggett, 505 U.S. at 651-52.  A delay of at least one year crosses this threshold.  Id., 505 U.S. at 652 n.1;  Vickers, 985 S.W.2d at 5.

The Defendant was arrested on December 16, 1997.  He was tried on March 7, 2001.  Thus, a period of approximately thirty-nine months passed between his arrest and trial.  However, a review of the technical record reveals that the Defendant's mental competency was at issue for approximately twenty-two of those thirty-nine months.  The Defendant was originally found competent to stand trial in April 1998.  In April 1999, defense counsel filed a motion to have the Defendant's mental competence reevaluated.  The trial court ordered evaluations in May, June and July 1999.  The Defendant was eventually judicially committed to hospitalization  in November 1999.  The trial court did not find the Defendant again competent to stand trial until March 2, 2001. The Defendant's trial began a few days later.

On July 15, 1999 and again on November 8, 1999, the Defendant filed pro se motions for a speedy trial.  Neither of these motions was granted.  Our standard of review is abuse of discretion. See State v. Jefferson, 938 S.W.2d 1, 14 (Tenn. Crim. App. 1996).

Obviously,  a delay of thirty-nine months crosses the one-year threshold necessary to find that the delay was "presumptively prejudicial."  However, while the delay was substantial in length, that does not, in and of itself, establish a constitutional violation.  See, e.g., Vickers, 985 S.W.2d at 7 (affirming the trial court's denial of the defendant's motion to dismiss for lack of a speedy trial where delay was three years and nine months).  We turn, then, to weighing the three remaining Barker factors to determine whether the Defendant's rights to a speedy trial were violated.

The second Barker factor is the reason for the delay.  The possible reasons for the delay of a defendant's trial fall into four categories:

(1) intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant;
(2) bureaucratic indifference or negligence;
(3) delay necessary to the fair and effective prosecution of the case; and
(4) delay caused, or acquiesced in, by the defense.

-10-

Vickers, 985 S.W.2d at 5-6. The trial court made no findings of fact that are present in the record before us as to the cause(s) of the delay(s) in bringing the Defendant to trial. The record does make independently clear, however, that the majority of the delay experienced in this case was due to the Defendant's mental illness and was therefore necessary to the fair and effective prosecution of the case. This type of delay is justifiable and therefore not weighed against either party. See State v. Wood, 924 S.W.2d 342, 346-47 (Tenn. 1996).

The third Barker factor is the Defendant's assertion of his right to a speedy trial. The Defendant filed two pro se motions asserting his right to a speedy trial, one in July 1999 and one in October 1999. The first of these motions was filed while the Defendant was undergoing a forensic evaluation at Middle Tennessee Mental Health Center. The second was filed following the State's motion to have the Defendant hospitalized and shortly before the trial court granted the State's motion. Given the questions surrounding the Defendant's mental competency during this time, and given that no motion for a speedy trial was ever filed by defense counsel, we give this factor no weight.

The fourth Barker factor - whether the Defendant was prejudiced by the delay - is the most important. "Prejudice . . . should be assessed in the light of the interests . . . the speedy trial right was designed to protect," which are "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." Barker, 407 U.S. at 532. The last of these three is the most serious because of its potential to skew the fairness of the entire system. See id.

The Defendant states in his brief that the delay "created difficulties in interviewing witnesses, gathering information, and . . . 'finding out the truth.'" These vague assertions do not demonstrate prejudice of any sort. The Defendant was convicted primarily upon the testimony of an eyewitness to the murder. The Defendant offers no explanation of how the delay affected this witness's testimony to his detriment. Certainly, the physical evidence and the medical records were unaffected in this case by the passage of time. There is no allegation - or evidence - that defense counsel were hamstrung in their efforts to prepare for trial by any delay. In short, the record before this Court does not demonstrate any prejudice suffered by the Defendant as a result of the delay in his being tried.

There being no abuse of discretion by the trial court in denying the Defendant's motions for a speedy trial, this issue is without merit.

**EXCESSIVE BAIL**

In his fifth issue the Defendant argues that the trial court violated his constitutional right against excessive bail. See Tenn. Const. art. I, §16; see also Tenn. Code Ann. § 40-11-102. The technical record indicates that the Defendant's bail was set at 1.5 million dollars. The technical record also indicates, however, that the Defendant never objected to the amount of his bail until after trial. Accordingly, this issue has been waived. See Tenn. R. App. P. 36(a); see also Tenn. Code Ann. §§ 40-11-143, -144; State v. Melson, 638 S.W.2d 342, 358 (Tenn. 1982) (defendant's only

effective remedy for setting of bail at $200,000 was to follow Rule 8 of the Tennessee Rules of Appellate Procedure <u>promptly</u> after bail was set - not to wait until after conviction).

## QUASHED SUBPOENA

In his sixth and final issue, the Defendant contends that the trial court committed reversible error when it quashed his subpoena for persons he intended to call at trial to question about the medical records generated in conjunction with the victim's death. The witnesses included five doctors from Erlanger Hospital, five employees of the Life Force Air Medical Service, and five nurses from Erlanger. In his brief, the Defendant states that "the trial court's action prohibited the Defendant from arguing that his wife was not dead."

At the hearing on the motion to quash, defense counsel explained that the witnesses were necessary to explain discrepancies in the medical records generated in conjunction with the victim's emergency treatment and death. As examples of the discrepancies, defense counsel pointed out differences in the operating room numbers and a discrepancy in the time of death. Two different doctors apparently "signed off" as chief surgeon. The trial court determined that the medical records would be admitted at trial and that "any discrepancies can be pointed out by anyone," rendering the presence of the medical personnel "unnecessary." The court explained that, even if the witnesses "freely admit[ted] that somebody made an error in the record[,] [t]hat would have very little bearing upon what the crux of this case is, and that's whether or not the deceased is dead and who was the cause of the death." The trial court specifically stated that it "[did not] see that [the Defendant's] defense is jeopardized by the State's motion to quash."

We acknowledge, of course, that defendants to criminal prosecution have the right under both our federal and state constitutions to compulsory process for obtaining witnesses in their favor. <u>See</u> U.S. Const. amend. VI; Tenn. Const. art. I, § 9. This right is further codified in our criminal code. <u>See</u> Tenn. Code Ann. § 40-17-105. The right, however, is not absolute. As previously recognized by this Court, "the constitutional right to compulsory process requires such process for, and only for, competent, material, and resident witnesses whose expected testimony will be admissible." <u>State v. Smith</u>, 639 S.W.2d 677, 680 (Tenn. Crim. App. 1982) (quoting <u>Bacon v. State</u>, 215 Tenn. 268, 385 S.W.2d 107, 109 (1964)). Thus, trial courts have "the power and the duty to prevent abuse of [their] process by abating subpoenas for witnesses whose testimony would be immaterial." <u>State v. Womack</u>, 591 S.W.2d 437, 443 (Tenn. App. 1979). In reviewing a trial court's exercise of its power and duty to prevent abuse of its process, this Court applies an abuse of discretion standard. <u>See</u> <u>State v. Connie Easterly</u>, No. M2000-00077-CCA-R10-CO, 2001 WL 208514, at *7 (Tenn. Crim. App., Nashville, Mar. 1, 2001).

The Defendant has failed to demonstrate that the trial court abused its discretion in quashing his subpoena for the attendance of numerous medical personnel. The victim's daughter testified that she saw the victim's body, made the funeral arrangements, and attended the funeral. A certified copy of the victim's death certificate was admitted at trial. There was no proffer of proof at trial that any of the witnesses attempted to be subpoenaed by the Defendant would have cast any doubt on the victim's death. In short, the Defendant has failed to demonstrate that any of these witnesses would

have offered material evidence and has failed to demonstrate that the trial court thereby abused its discretion in quashing his subpoena.  Accordingly, this issue is without merit.

The judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE