IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 30, 2003

## STATE OF TENNESSEE v. HENRY MITCHELL DIXON

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S44,157 & S44,159      Phyllis H. Miller, Judge**

_____

**No. E2002-00731-CCA-R3-CD**
**October 22, 2003**
_____

A Sullivan County Jury convicted the appellant, Henry Mitchell Dixon, Jr., also known as "Mackie" Dixon, of one count of attempted first degree murder (Count One), one count of attempted second degree murder (Count Two), one count of attempted aggravated assault (Count Four), two counts of aggravated assault (Counts Three and Five), one count of unauthorized use of a vehicle (Count Six), and one count of aggravated burglary (Count Seven). The trial court sentenced the appellant to an effective twenty-two (22) year sentence as a Range I offender for Counts One through Six and four (4) years probation on Count Seven, to run consecutively to the twenty-two (22) year sentence. The appellant filed a motion for a new trial, which was denied. On appeal, the appellant challenges the sufficiency of the evidence at trial, his sentence, and the trial court's refusal to set aside the appellant's conviction for attempted first degree murder based on the jury foreman's statement after the trial that there was a mistake as to how the verdict was returned. After a thorough review of the record, we conclude that none of these claims merit relief. However, we must reverse and remand the conviction for attempted second degree murder due to an erroneous jury charge on the definition of "knowingly." In all other respects the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed in Part, Reversed in Part and Remanded.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

Richard A. Tate, Assistant Public Defender, Blountville, Tennessee, for the appellant, Henry Mitchell Dixon.

Paul G. Summers, Attorney General & Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Greeley Wells, District Attorney General; and Teresa Murray Smith, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

The appellant met Sarah Gardner and Clayton Johnson in 1998 in Bristol, Tennessee. The three became quick friends; the appellant and Ms. Gardner began dating and the appellant and Mr. Johnson often went to local nightclubs together. When Ms. Gardner became pregnant with the appellant's child in 1999, the couple moved in together. Ms. Gardner gave birth to the appellant's daughter in November of that year. The couple lived together from 1999 until April of 2000, when Ms. Gardner and child moved out. In May of 2000, Ms. Gardner began dating Mr. Johnson. The appellant saw his daughter a few times after the couple separated.

On June 16, 2000, the appellant called Ms. Gardner from Food City, his place of daytime employment, to request visitation with his daughter on the upcoming Father's Day holiday. He was unable to reach her by phone at that time. Later that day, Ms. Gardner returned the appellant's phone call. The two argued on the phone because the appellant was upset about the lack of time he was spending with his daughter and Ms. Gardner was upset because the appellant was threatening to "go away." At that point, Ms. Gardner informed the appellant that she intended to change the child's last name from his to hers. The appellant threatened Ms. Gardner, saying that he would "get" her.

The appellant was so upset that he left work early and rode around in his car, a gold Dodge Dynasty, trying to cool off. He played some video games at a laundromat and drove by Mr. Johnson's home, where he was seen by Mr. Johnson's younger brother. According to Ms. Gardner's best friend, the appellant also drove by her house where he flashed a gun that he purchased approximately one week earlier with the intention of killing himself. Ms. Gardner's best friend immediately told Ms. Gardner what she witnessed. The appellant did not deny that he drove by these houses, but denied flashing the weapon.

When Ms. Gardner got off work at around 5:00 p.m., she picked up Mr. Johnson in her blue Honda Prelude. Around 8:45 p.m., Ms. Gardner and Mr. Johnson drove back to Mr. Johnson's house to pick up his younger brother, age thirteen, to take him to Gilligan's, a club that sponsored a "teen night" on Fridays. At around 9:00 p.m., on their way to drop off the younger brother, they turned onto Volunteer Parkway in Bristol, Tennessee. They saw the appellant driving behind them. The appellant positioned his car behind the Honda, sped up, and rammed the car twice at a red light. The impact was such that the air bag in the appellant's car deployed on impact.

At that time, Mr. Johnson instructed his younger brother to get down in the floorboard of the car. Ms. Gardner began screaming and crying. Mr. Johnson exited the car, intending to fight the appellant. The appellant reached under the passenger seat of his vehicle and grabbed his loaded forty caliber Smith & Wesson handgun. The appellant also reached into the glove box to get out a box of nine-millimeter ammunition. The appellant got out of the car with the gun and fired a shot,

striking Mr. Johnson in the left hip.  The appellant stated that at the time Mr. Johnson got out of the car, his hands were not visible.  After the shot was fired, Ms. Gardner and Johnson's brother got out of the car.  Mr. Johnson testified that after the appellant shot him, he saw the appellant point the gun at Ms. Gardner.  It appeared to him that the appellant was trying to shoot the gun, but it did not fire.  The younger brother ran away from the scene down Volunteer Parkway towards a hotel.  After realizing that he was shot,  Ms. Gardner grabbed Mr. Johnson's arm and the two ran up Hill Street together.  The appellant followed them on foot.  At some point, Ms. Gardner let go of Mr. Johnson because she was "really scared" and she could run faster if they separated.  She ran back down the hill towards the vehicle on Volunteer Parkway when the appellant yelled, "See, I told you I would get you."  Mr. Johnson proceeded to run away from the scene onto Windsor, where he went to a house and asked the resident to call 911.

Back on Volunteer Parkway, the appellant chased Ms. Gardner around her car with the gun.  She ducked behind the car, watched the appellant's feet, and made a break for it when she saw the appellant  walking around the car.  She ran up to a grey car that was stopped at a red light and got into a car with a stranger.  The driver of the car drove her to Bojangel's Restaurant and called 911.

After Ms. Gardner got into the grey car, the appellant got into Ms. Gardner's blue Honda, and drove off, eventually parking the vehicle at Rooster Front Park in Bristol, at the base of the Blue Ridge Subdivision where Ms. Gardner lived with her grandmother.

The Bristol police responded to the scene after receiving a call that shots were fired in the vicinity of Applebees restaurant on Volunteer Parkway.  Lieutenant Jerry Smeltzer arrived at the scene and discovered the appellant's Dodge Dynasty resting at the concrete base of a light fixture.  Inside the vehicle, the police found a box of nine-millimeter ammunition and two knives.  An unfired nine-millimeter bullet was found lying in the roadway near the vehicle.  After talking to some of the witnesses and victims, the police realized that the appellant probably left the scene in Ms. Gardner's blue Honda Prelude.

Ms. Gardner was transported to the hospital where she was treated and released.  She then went to her residence at 205 Redwood Drive to meet her grandmother, the owner of the home.

After abandoning the Honda, the appellant walked to the area near 205 Redwood Drive, where he observed the police and Ms. Gardner's family at the residence.  Ms. Gardner and her family left to spend the night at a motel as instructed by the police because the appellant was still at large.  After the police left, the appellant climbed onto the roof of the residence where he observed Ms. Gardner and her family inside the house.

When the family left, the appellant climbed down from the roof, used the house keys from the Honda keychain, and entered the home.  He slept for about an hour, changed clothes, and looked around for the keys to a Subaru which belonged to Ms. Gardner's mother.  Because he could not find the keys to the Subaru,  he went back to Rooster Front Park where he discovered that the Honda was gone.  The appellant walked through the woods to the area behind K-Mart, where he wrapped the

gun, a jewelry box containing a pendant with the initial "S" on it, and a black cigarette case[1] inside a sweatshirt and stowed them beside a metal barrel.

The police were still on the lookout for the appellant the following morning. Michael Vance, a Bristol Police officer, located the appellant in front of K-Mart in Bristol. Officer Vance exited his vehicle and asked the appellant to stop and produce some identification. The appellant took off, running towards the rear of the building. Officer Vance radioed for backup while continuing to search for the appellant. The search continued in the wooded area behind K-Mart for approximately forty-five minutes, when the appellant was finally spotted and a foot chase ensued. At one point, an officer was close enough to the appellant to grab his shoe, which came off, but the appellant kept running.

The appellant was spotted running into a convenience store. He was cornered by an officer inside the store, who attempted to subdue the appellant with pepper spray. The appellant then picked up a gallon of antifreeze and proceeded to drink from it. The appellant made a run out the door but was tackled by an officer in the parking lot of the convenience store. The appellant was read his Miranda rights, arrested and taken to the hospital for treatment for ingestion of antifreeze.

Officer Smeltzer located the sweatshirt, gun, necklace, and cigarette case behind K-Mart. He then went to the hospital to serve an arrest warrant on the appellant. While at the hospital, Officer Smeltzer got a signed statement from the appellant regarding the incident. Although the appellant was undergoing treatment for antifreeze ingestion, Officer Smeltzer testified that the appellant was coherent and oriented. The statement taken by Officer Smeltzer and signed by the appellant states as follows:

> On Friday, Six, Sixteen, Two Thousand, my girlfriend, Sarah Gardner, called me at work and told me she wanted to file papers changing our daughter's name to her last name. This greatly upset me and I told my manager I had to leave. I went driving around looking for Sarah. I could not find her so I went over by her cousin's house and by Clayton Johnson's home. I did see Clayton's brother and his mother out in their yard and Sarah's cousin at her house on Virginia Avenue. I then went to the laundry mat on Pennsylvania Avenue and played some video games. I left there about nine p.m. and started back out town. I saw Clayton and Sarah and another guy in her car turn up towards La Carreta [a restaurant]. I turned around and got behind her. She turned on the Parkway but would not pull over. I got upset over this and hit the gas running into the rear of her vehicle twice. She did pull over at this point. The airbag in my vehicle had deployed. I got out of my vehicle with my gun and approached them. I remember Clayton getting out of the passenger side of the vehicle and yelling at me. I shot at Clayton and turned my gun on Sarah. I was going to shoot her also but my gun jammed. She was running around screaming and finally

---

[1] The jewelry and the cigarette case were both items later identified as being taken from the residence at 205 Redwood.

got into some car and left south on the parkway. The third guy ran across in between us towards the Days Inn. I ran back and got into Sarah's car. I had to take it to get away because mine would no longer run. I went down the Parkway and over to Rooster Front Park and left the car. I took the key and walked back over to Redwood road to Sarah's grandmother's house. I sat in the bushes and watched the police over at the house for some time. After the police left, I went over to the house and climbed up on the roof. I watched everybody inside through the skylight. After they left, I climbed down and used the house keys and went inside. I sat in the living room rocker and slept for about an hour. I changed my clothes and started looking around the house for the keys to the Subaru. I was planning on taking the Subaru but could not find the keys. I went back down to Rooster Front and discovered the police had taken Sarah's car. I walked through the park trail and came on Steele Creek Park side. I walked up the hill behind K-Mart where I hid the gun beside a metal barrel. I walked over behind K-Mart where a bald headed policeman stopped me for some ID. I took off running from him and hid in the weeds until they left. I then walked over towards the Appco [convenience store]. I went inside and another police officer come [sic] running in after me. I grabbed a bottle of antifreeze and tried to drink it. The officer sprayed me with pepper spray and I took off running outside. The officer ran after me and tackled me. He then handcuffed me and took me to the hospital. I had bought my gun at Uncle Sam's Pawn Shop about a week ago with the purpose of killing myself. I meant to shoot Clayton and Sarah but not aiming to kill them just to get my point across. The keys to all the vehicles and he house were on her key ring when I took her car.

The Honda was located by the police at Rooster Front Park the day following the incident. The car had collision damage to the rear of the vehicle. Officer Smeltzer testified that he found a nine-millimeter shell casing in the front floorboard along with a pocketbook containing Ms. Gardner's driver's license.

When Ms. Gardner and her family returned home the next morning, they realized that someone had broken into the residence at 205 Redwood and removed several items without their permission.

Several witnesses came forward after the incident and reported seeing a man with a gun chasing a woman around a car in the area where the incident occurred. At least one of the witnesses was able to identify the appellant as the man with the gun.

On July 25, 2000, the Sullivan County Grand Jury returned an indictment against the appellant charging him with the attempted first degree murder of Mr. Johnson and Ms. Gardner; the aggravated assault of Mr. Johnson, Ms. Gardner, and the younger brother; theft of over $1,000 for the Honda; and the aggravated burglary of 205 Redwood.

A jury trial was held on July 23, 24, and 25, 2001 in the Criminal Court for Sullivan County, Tennessee where the jury found the defendant guilty in count one of attempted first degree murder, guilty in count two of attempted second degree murder, guilty in count three and five of the aggravated assault of Ms. Gardner and the younger brother, guilty in count four of the attempted aggravated assault of Mr. Johnson, guilty in count six of theft over $1,000, and guilty in count seven of aggravated burglary.

A sentencing hearing was held on September 11, 2001, where the trial court sentenced the appellant to an effective sentence of twenty-two years as a Range I, standard offender in counts one through six. In count seven, the trial court sentenced the appellant to four years of supervised probation to run consecutively to counts one through six. The appellant filed a motion for new trial, which was denied, and this appeal as of right ensued.

On appeal, the appellant argues: (1) that the evidence was insufficient to sustain the convictions for attempted first degree murder and attempted second degree murder; (2) that the trial court imposed an improper sentence; and (3) that the trial court erred by not setting aside the conviction for attempted first degree murder when the jury foreperson came forward after the trial to report a mistake in how the verdict was reported. The state argues that the evidence was sufficient to support the convictions, the trial court properly sentenced the appellant, and the trial court correctly refused to set aside the conviction for attempted first degree murder. We reverse the judgment of the trial court on a ground not raised by either party.

## Sufficiency of the Evidence

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" state's witnesses and resolves all conflicts in the testimony in favor of the state. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the state "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779.

In the case herein, the appellant was charged with two counts of attempted first degree murder and the jury returned a verdict finding the appellant guilty of one court of attempted first degree murder and one count of attempted second degree murder. These are the only two charges challenged by the appellant on appeal. Specifically, the appellant argues that the evidence is insufficient to substantiate two charges of attempted first degree murder because there was only one shot fired on June 16, 2000. Further, the appellant argues that "a jury could not find him guilty of attempted first degree murder [of Mr. Johnson] in count one and attempted second degree murder [of Ms. Gardner] in count two." The state argues that a jury could reasonably conclude that the appellant committed the offenses of attempted first degree murder and attempted second degree murder.

## A. Attempted First Degree Murder

To convict the defendant of the attempted first-degree murder of Mr. Johnson and/or Ms. Gardner, the jury must have found that the defendant unlawfully, intentionally, and with premeditation attempted to kill Mr. Johnson and/or Ms. Gardner. See Tenn. Code Ann. §§ 39-12-101 & -13-202. The Tennessee attempt statute provides:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.
> (b) Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense.
> (c) It is no defense to prosecution for criminal attempt that the offense attempted was actually committed.

Tenn. Code Ann. § 39-12-101.

Tennessee Code Annotated section 39-13-202(a)(1) defines first degree murder in pertinent part as "a premeditated and intentional killing of another." Tennessee Code Annotated section 39-13-202(d) provides:

> As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the

accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d). Therefore the State was required to prove beyond a reasonable doubt that the defendant attacked the victim with "premeditation."

A premeditated act is one done after exercise of reflection and judgment. See id. § 39-3-202(d). "[W]hether premeditation is present is a question of fact for the jury, and it may be inferred from the circumstances surrounding the" commission of the crime. State v. Debow, No. M1999-02678-CCA-R3-CD, 2000 WL 1137465, at *4 (Tenn. Crim. App. Aug. 2, 2000); see also State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Anderson, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). Some relevant factors that tend to support the existence of premeditation include: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, calmness immediately after the killing," and evidence that the victim was retreating or attempting to escape when killed. Bland, 958 S.W.2d at 660; see also State v. West, 844 S.W.2d 144, 148 (Tenn.1992). "[T]he fact that repeated blows (or shots) were inflicted on the victim is not sufficient, by itself, to establish first-degree murder." State v. Brown, 836 S.W.2d 530, 542 (Tenn.1992).

Thus, to support a charge of attempted first degree murder, the state must prove that the appellant intended to murder Mr. Johnson and/or Ms. Gardner with premeditation, and that the appellant acted to accomplish the murder. The jury found the appellant guilty of the attempted first degree murder of Mr. Johnson. Here, the evidence shows that on the evening of June 16, 2000, the appellant drove by the home of Ms. Gardner's cousin and held up a gun. The appellant testified that he was angry at Ms. Gardner after she informed him that she intended to change their child's last name and that he had to leave work just to cool down. Later that night, while the appellant was driving around, he spotted Ms. Gardner and Mr. Johnson in a vehicle and rammed into that vehicle. When Mr. Johnson exited Ms. Gardner's car, the appellant grabbed his gun, got out of his car, and shot at Mr. Johnson, striking him in the left hip. The appellant's own signed statement reads, "I got out of my vehicle with my gun and approached them. I remember Mr. Johnson getting out of the passenger side of the vehicle and yelling at me. I shot at Clayton. . . . I meant to shoot Clayton . . . but not aiming to kill . . . just to get my point across." The jury apparently did not believe that the appellant shot the deadly weapon at Mr. Johnson merely to "get [his] point across." The evidence supports the jury's finding that the appellant committed attempted first degree murder.

### B. Attempted Second Degree Murder

In order to convict a defendant of attempted second-degree murder, the state is required to prove that the defendant acted with the intent to cause the knowing killing of another, believing his conduct would cause the result without further conduct on his part. Tenn. Code Ann. §§ 39-12-

101(a)(2) and 39-13-210(a).  Whether the appellant "knowingly" attempted to kill his victim is a question of fact for the jury.

> Knowing refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist.  A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn. Code Ann. § 39-11-302(b).

Intent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence.  State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000); State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993).

The jury found the appellant guilty of the attempted second degree murder of Ms. Gardner. Again, the evidence shows that the appellant drove by the home of Ms. Gardner's cousin and held up a gun.  The appellant himself testified that he was angry at Ms. after she informed him that she intended to change their child's last name and that he had to leave work just to cool down.  Ms. Gardner testified that during their phone conversation, the appellant threatened her by saying he was going to "get" her.  Later that night, the appellant rammed into Ms. Gardner's vehicle twice.  After the appellant shot Mr. Johnson, Ms. Gardner exited the vehicle and began to run up the hill with Mr. Johnson.  The two separated at some point and Mr. Johnson testified that he saw the appellant with the gun "in her [Ms. Gardner's] back" and that it appeared the appellant was trying to fire the gun. Ms. Gardner was screaming and crying and testified that she heard the appellant say, "I told you I would get you."  Ms. Gardner remembered seeing the appellant hold the gun sideways and, "hearing him, like he was messing with a gun or something.  It was like it was clicking, like a clicking noise. . . ." The appellant also admitted in his statement that he intended to shoot Ms. Gardner, but the gun jammed.  Additionally, several eye witnesses reported seeing a man pointing a gun at a woman at the location where the incident occurred.  The evidence supports the jury's finding of guilt on the charge of attempted second degree murder.

Sentencing

On appeal, the appellant argues that the trial court erred in applying certain enhancement factors.  Specifically, he argues that the trial court erred in applying enhancement factors (9) and (16)

to his convictions for attempted first degree murder and attempted second degree murder.[2] The State counters that the trial court correctly applied enhancement factor (9) and concedes that the trial court incorrectly applied enhancement factor (16), but argues that the record supports the sentence imposed by the trial court. After reviewing the record, we agree that the trial court incorrectly applied enhancement factor (16), but conclude that the record supports the sentence imposed by the trial court despite the erroneous application of the enhancement factor.

"When reviewing sentencing issues . . . , the appellate court shall conduct a de novo review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider the defendant's potential for rehabilitation, the trial and sentencing hearing evidence, the pre-sentence report, the sentencing principles, sentencing alternative arguments, the nature and character of the offense, the enhancing and mitigating factors, and the defendant's statements. Tenn. Code Ann. §§ 40-35-103(5), -210(b); Ashby, 823 S.W.2d at 169. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." Ashby, 823 S.W.2d at 169.

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

In balancing these concerns, a trial court should start at the presumptive sentence, enhance the sentence within the range for existing enhancement factors, and then reduce the sentence within the range for existing mitigating factors. Tenn. Code Ann. § 40-35-210(e). No particular weight for each factor is prescribed by the statute. See State v. Santiago, 914 S.W.2d 116, 125 (Tenn. Crim. App. 1995). The weight given to each factor is left to the discretion of the trial court as long as it

---

[2] 2002 Tennessee Public Acts, Chapter 849, section 2(c), which became effective after the appellant's trial in this matter added subsection (1) to Tennessee Code Annotated section 40-35-114, relating to acts of terrorism, and redesignated former subsections (1) to (22) as (2) to (23). Therefore, the appellants complaints as to the trial court's application of enhancement factors (9) and (16) correspond to the redesignated subsections of (10) and (17). However, because the application of the enhancement factors in this case occurred prior to the addition of the new subsection (1), we will refer to the enhancement factors by their old designations.

comports with the sentencing principles and purposes of our code and as long as its findings are supported by the record.  Id.

In imposing the appellant's sentence on the charges of attempted first degree murder and attempted second degree murder, the trial court found the existence of several statutory enhancement factors, including: (1) that the appellant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense, Tenn. Code Ann. § 40-35-114(9) (2000); (2) that the crime was committed under circumstances under which the potential for bodily injury to a victim was great, Tenn. Code Ann. § 40-35-114(16) (2000).[3]

Turning specifically to the facts of this case, the appellant  was first convicted of attempted first degree murder and attempted second degree murder.  Since attempted first degree murder is a Class A felony, the starting point for sentencing determinations is the middle of the range.  See Tenn. Code Ann. § 40-35-210(c).  Undisputably, this appellant was a Range I offender; thus, twenty years was the mid-point against which the trial court was to balance any mitigating and enhancement factors.

Attempted second degree murder is a Class B Felony and the starting point for sentencing determinations is the minimum sentence within the appellant's sentencing range.  See Tenn. Code Ann. § 40-35-210(c).  This appellant was a Range I offender; thus, the appellant's sentencing range is eight to twelve years.  Accordingly, the trial court was required to start with the appellant's presumptive sentence, eight years, increase his sentence by applying any relevant enhancement factors, and then reduce his sentence by applying any mitigating factors.

## A.  Enhancement Factor (9)

The appellant first challenges the trial court's application of enhancement factor (9) to his sentence on the charges of attempted first degree murder and attempted second degree murder.  He argues that counts one and two of the indictment (indicting the appellant with two separate counts of attempted first degree murder) state that the appellant used a handgun in the commission of the offense and "to enhance count one and two would in fact be enhancing an offense because of an element that is inherent in the charge."

The trial court sentenced the appellant to the presumptive sentence of twenty years for the attempted first degree murder and enhanced that sentence to twenty-four years, finding as enhancement factors that the appellant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, that the appellant had no hesitation about committing the crime when the risk to human life was high, that the crime was committed under circumstances under which the potential for bodily injury of a victim was great, and that the appellant used a handgun in the commission of the offense.  See Tenn. Code Ann. § 40-35-114(1), (9), (10), & (16).  The trial court found no statutory mitigating factors with respect to the

_____

[3]The trial court applied enhancement factor (16) only to the charge of attempted first degree murder.

charge, but gave some weight to several non-statutory mitigating factors including the appellant's excellent work history and voluntary confession of guilt. The trial court reduced the appellant's enhanced sentence on attempted first degree murder from twenty-four years to twenty-two years.

The trial court sentenced the appellant to a presumptive sentence of eight years on the attempted second degree murder charge and enhanced that sentence to twelve years, finding as enhancement factors that the appellant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, that the appellant used a handgun in the commission of the offense, that the appellant had no hesitation about committing the crime when the risk to human life was high, and that the appellant abused a position of private trust that significantly facilitated the commission or the fulfillment of the offense. See Tenn. Code Ann. § 40-35-114(1), (9), (10), (15). The trial court found no statutory mitigating factors and declined to apply either non-statutory mitigating factor to the attempted second degree murder charge because he gave greater weight to the enhancement factors than the mitigating factors, especially enhancement factor (10), because the appellant "chased [Ms. Gardner] around the car trying to shoot her, trying to get the gun unjammed with all the traffic passing by very close . . . ."

This court has held that enhancement factor (9) is not an essential element of attempted first degree murder or an essential element of second degree murder. See Tenn. Code Ann. § 40-35-114(9) (2000); State v. Makoka, 885 S.W.2d 366, 373 (Tenn. Crim. App. 1994); State v. Bills, No. W2001-00396-CCA-R3-CD, 2002 WL 974673, at *5 (Tenn. Crim. App. May 10, 2002); State v. Osborne, No. M2000-00802-CCA-R3-CD, 2001 WL 252083, at *6 (Tenn. Crim. App. Mar. 14, 2001) (perm. to appeal denied Sept. 17, 2001). The evidence is undisputed that the appellant utilized a firearm in the commission of the crimes for which he was convicted. Thus, the trial court correctly applied enhancement factor (9) to the appellant's sentence on the charges of attempted first degree murder and attempted second degree murder.

## B. Enhancement Factors (15) and (16)

The appellant also argues on appeal that the trial court erroneously applied enhancement factor (16), "the crime was committed under circumstances under which the potential for bodily injury to the victim was great," Tenn. Code Ann. § 40-35-114(16) (2000), contending that this factor is inherent in the charge of attempted first degree murder. The state agrees that the trial court incorrectly applied enhancement factor (16) because this court, in State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995), held that Tennessee Code Annotated section 40-35-114(16) (2000) should not be applied to a sentence for attempted first degree murder because a high "risk to human life and the great potential for bodily injury always exist with an attempted first degree murder." We agree with the appellant and the state that the trial court erroneously applied enhancement factor (16) to the appellant's sentence for attempted first degree murder. Moreover, we believe the trial court erred in applying factor (15), that the appellant abused a position of private trust to facilitate the commission of the offense. The appellant and Ms. Gardner were estranged from each other and there is no proof in the record that the fact that the two were the parents of a small child facilitated the commission of these offenses. Consequently, this enhancement factor should not have been applied

in this case. However, we note that the wrongful application of one or more enhancement factors by the trial court does not necessarily lead to a reduction in the length of the sentence. See State v. Winfield, 23 S.W.3d 279, 284 (Tenn. 2000). A determination that one or more enhancement factors were improperly considered requires that we review the evidence supporting any remaining enhancement factors, as well as the evidence supporting any mitigating factors. State v. Imfeld, 70 S.W.3d 698, 707 (Tenn. 2002).

Looking to the remaining enhancement factors, the trial court applied enhancement factors (1), (9), and (10) in addition to the erroneously applied factors (15) and (16) in determining the appellant's sentence for attempted first degree murder. See Tenn. Code Ann. (2000) § 40-35-114(1), (9), (10), & (16). The appellant's history of criminal convictions or criminal behavior was listed in the presentence report. See Tenn. Code Ann. § 40-35-114(1). The appellant, a high school graduate who was twenty-two years old at the time of sentencing, had convictions for speeding, operating an uninspected vehicle, and a charge for shoplifting which was reduced to interfering with the property rights of another. The appellant also admitted illegal drug use, reporting that he first used alcohol at the age of seventeen. He admitted to drinking several times a month in high school and four or five bottles of beer everyday after work once he graduated from high school. The appellant also admitted to using marijuana several times a month in high school and reported his last use of the illegal substance in 1998. Thus, enhancement factor (1) was properly applied.

The appellant had no hesitation about committing the crime when the risk to human life was high as evidenced by the commission of these shooting crimes in the presence of a multitude of potential victims on a heavily trafficked highway. See Tenn. Code Ann. § 40-35-114(10).[4] Finally, there is no dispute that the appellant used a handgun in the commission of the offense. See Tenn. Code Ann. § 40-35-114(9).

After reviewing the application of the remaining enhancement and mitigating factors with respect to the sentence on the charge of attempted first degree murder and attempted second degree murder, we conclude that despite the erroneous application of enhancement factors (15) and (16), the remaining enhancement factors applied by the trial court support the sentence imposed by the trial court of twenty-two (22) years for attempted first degree murder and twelve (12) years for attempted second degree murder. Accordingly, we believe that the trial court imposed appropriate sentences for the appellant's attempted first degree murder and attempted second degree murder convictions.

### Setting Aside the Verdict

Finally, the appellant argues that the trial court erred in not setting aside the verdict in count one, attempted first degree murder due to a mistake on the part of the jury in rendering the verdict. The state disagrees.

---

[4]This enhancement factor refers to the risk posed to persons other than the victim of the crime.

After the jury verdict was rendered, the appellant filed a motion for new trial. In that motion, the appellant alleged that the jury foreman, Jeffrey Needham, called the court the day after the trial to report that there was a mistake as to how the verdict was returned. At the hearing on the motion for new trial, the appellant asked the court to hear the testimony of Mr. Needham. The trial court allowed the appellant to proffer the testimony of Mr. Needham, but declined to accept it under the theory that a juror cannot impeach his or her verdict under Tennessee Rule of Evidence 606(b).

The appellant chose to proffer the testimony of the jury foreman at the hearing. Mr. Needham testified that at the trial, he had erroneously reported the verdict of the jury to be guilty on count one of the attempted first degree murder of Mr. Johnson and guilty on count two of the attempted second degree murder of Ms. Gardner, when in fact the jury verdict with respect to count one was attempt to commit second degree murder against Mr. Johnson and the verdict with respect to count two was attempt to commit first degree murder against Ms. Gardner.

According to the transcript at trial, the trial court stated the following after the verdict was read:

> All right, Members of the Jury, you have heard your foreman state that in count One, you have found the Defendant . . . guilty of attempt to commit first degree murder and that you do not fix a fine. Is that the verdict of each and every juror? If so, would you please indicate by raising your right hand?

The jury was then polled and each juror raised their hand, indicating unanimous agreement with the verdict of the attempted first degree murder of Mr. Johnson. The jury was again polled after the verdict was read by the foreman in count two, and again, the jury unanimously agreed that their verdict in count two was attempt to commit the second degree murder of Ms. Gardner.

Rule 606(b) of the Tennessee Rules of Evidence provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

"In <u>Montgomery v. State</u>, 556 S.W.2d 559 (Tenn. Crim. App. 1977) and <u>State v. Fuino</u>, 608 S.W.2d 892 (Tenn. Crim. App. 1980), it was noted that Federal Rule of Evidence 606(b) was

essentially a codification of Tennessee law in respect to the admissibility of juror testimony when the validity of a verdict is challenged and, accordingly, used the rule as the law in Tennessee." State v. Blackwell, 664 S.W.2d 686, 688 (Tenn. 1984) (adopting the federal rule as the rule governing the exclusion and admissibility of evidence to impeach a jury verdict in Tennessee). Rule 606(b) of the Tennessee Rules of Evidence became effective in 1990. According to the Advisory Commission Comments after the rule, a juror "may testify or submit an affidavit in connection with a motion for new trial" only in the three limited circumstances enumerated in the rule. Tenn. R. Evid. 606 Advisory Comm'n. Comments.

The law of this state is well-settled that after a jury has been discharged from court, it may not be reassembled to amend, correct or impeach its verdict. See, e.g., State v. Jefferson, 938 S.W.2d 1 (Tenn. 1996); Clark v. State, 170 Tenn. 494, 500, 97 S.W.2d 644, 646 (1936); State v. Green, 995 S.W.2d 591, 606-614 (Tenn. Crim. App.1998); State v. Morris, 788 S.W.2d 820 (Tenn. Crim. App. 1990). The sound rationale for this rule is that once the jury has been discharged, its members have been separated from the trial court and are subject to outside contacts; thus, further action involving the fate of the accused would be improper. See Green, 995 S.W.2d at 612-13.

The alleged mistake involved in the jury verdict herein did not involve any of the instances enumerated in Tennessee Rule of Evidence 606(b) which would allow a juror to testify as to the validity of a verdict. The appellant did not allege that the jury was influenced by extraneous prejudicial information, outside influence or that there existed an agreement by the jurors to be bound by a quotient or gambling verdict. The appellant was indicted on two counts of attempted first degree murder and was convicted by the jury of one count of attempted first degree murder and one count of attempted second degree murder. The alleged error of the jury foreperson in reading the verdict did not result in the appellant being convicted of an offense greater than the original indicted charges. We find this issue without merit.

<u>Jury Instructions for Attempted Murder</u>

(a) <u>Attempted Second Degree Murder</u>

Although not raised by either party on appeal, we note that the appellant was charged with attempted second degree murder, which requires the trial court to give a jury instruction on the definition of "knowingly." In the case herein, in regards to the second degree murder charge, the trial court instructed the jury that:

> Any person who attempts to commit second degree murder is guilty of a crime. For you to find the defendant guilty of attempt to commit second degree murder, the State must have proved beyond a reasonable doubt the existence of the following essential elements:
> (1) that the defendant intended to commit the specific offense of second degree murder; and

(2)(a) that the defendant did some act or caused something to happen that would have constituted second degree murder if the defendant's beliefs at the time he acted had in fact been true; or
(b) that the defendant did some act intending to cause an essential element of second degree murder to occur, and at the time believed the act would cause the element to occur without further action on the defendant's part; or
(c) that the defendant did some act intending to complete a course of action or cause a result that would constitute second degree murder under the circumstances, as the defendant believed them to be at the time, and his actions constituted a substantial step toward the commission of second-degree murder. The defendant's actions do not constitute a substantial step unless the defendant's entire course of action clearly shows his intent to commit second degree murder.
"Intentionally" means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.
Murder in the second degree by definition includes all of the following essential elements:
(1) the killing is unlawful; and
(2) the killing is committed knowingly.
"Knowingly" means that a person acts knowingly with respect to the conduct or to the circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonable certain to cause the result. The requirement of knowingly is also established if it is shown that the defendant acted intentionally.

This court has acknowledged that second degree murder qualifies as a result-of-conduct (rather than nature-of-conduct) offense wherein the defendant, in order to be guilty, must be aware that his or her conduct is reasonably certain to cause death. State v. Page, 81 S.W.3d 781, 788 (Tenn. Crim. App. 2002) (interpreting State v. Ducker, 27 S.W.3d 889 (Tenn. 2000)). In Page, the appellant, who was drunk, admitted striking the victim with a baseball bat but contended that he had no intention to kill. The appellant was convicted of second degree murder. The trial court's instructions defined "knowingly" to include an appellant's awareness (1) that his conduct is of a particular nature, (2) that a particular circumstance exists, or (3) that his conduct was reasonably certain to cause the result. Page, 81 S.W.3d at 786. This court granted Page a new trial where the appellant's mens rea was in dispute because the instructions improperly lessened the state's burden of proof by allowing the jury to convict on second degree murder based only upon awareness of the nature of the conduct or circumstances surrounding the conduct.

Given that the trial court's instruction on the definition of "knowingly" was erroneous in this case, we must now determine the appropriate standard of review. An "erroneous jury instruction, which misstates the applicable conduct element of an offense and lessens the state's burden of proof, is . . . subject to constitutional harmless error analysis." Id. at 789.

> We recognize that in many, if not most, homicide trials, the <u>mens</u> <u>rea</u> jury instructions utilized in this case would be harmless error. If a victim is shot at point blank range with a twelve gauge shotgun while asleep, and the defense is the defendant was not the shooter, then the erroneous instruction would likely be harmless. In such a situation, the *mens rea* is not a disputed issue at trial. Similarly, if causation is not disputed in a homicide trial, the failure to instruct the jury on causation may well be harmless. <u>See State v. Farner</u>, 66 S.W.3d 188, 206 (Tenn. 2001).

<u>Id.</u>

In the case herein, we recognize that one of the disputed issue at trial and the primary theory of the defense was the <u>mens</u> <u>rea</u> of the appellant. The statement signed by the appellant and introduced at trial stated that he "meant to shoot Clayton and Sarah but not aiming to kill them just to get my point across." This statement indicates that the appellant did not intend the result of his actions to be the death of either Ms. Gardner or Mr. Johnson. Therefore, the jury, if it had believed the appellant and if it had been properly instructed, could have determined that the appellant was not guilty of attempted second degree murder. On the other hand, under the instruction as given, even if the jury believed the appellant had no intention to kill, his knowing acts with respect to his conduct in shooting at his victims could furnish the basis for a conviction. While the trial in this case occurred nearly a year before our decision in <u>Page</u>, and it was "far from clear at the time of trial how the 'knowing' <u>mens</u> <u>rea</u> for second degree murder should be defined in jury instructions," it was in the "pipeline" at the time the decision in <u>Page</u> was rendered. <u>Id.</u> at 788. We have applied our decision in <u>Page</u> retroactively to cases that were in the "pipeline" at the time of that decision. <u>See</u>, e.g., <u>State v. Standridge</u>, No. M2002-01699-CCA-R3-CD, 2003 WL 22243249 (Tenn. Crim. App. Sept. 30, 2003, at Nashville); <u>State v. Faulkner</u>, No. W2001-2614-CCA-R3-DD, 2003 WL 22220341 (Tenn. Crim. App. Sept. 26, 2003, at Jackson); <u>State v. Lawrence</u>, No. W2001-02638-CCA-R3-CD, 2003 WL 22318461 (Tenn. Crim. App. Nov. 5, 2002, at Jackson). Applying our decision in <u>Page</u> to the case herein, we are unable to conclude that the trial court's failure to instruct the jury with the proper definition of "knowingly"as to the second degree murder charge was harmless beyond a reasonable doubt because it improperly lessened the state's burden of proof. Accordingly, the judgment of the trial court with respect to the conviction of attempted second degree murder is reversed and remand for a new trial.

(b) <u>Attempted First Degree Murder</u>

After the jury instructions on the law of attempt, the trial court instructed the jury on first degree murder as follows:

> Murder in the first degree by definition includes all of the following essential elements:
>
> (1) the killing in unlawful; and
> (2) the killing is intentional; and

(3) the killing is premeditated.

"Intentionally" means that person acts intentionally with respect to the nature of the conduct *or* to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.

First degree murder, like second degree murder, is a result-of-conduct offense. <u>State v. Antionette Hill</u>, No. E2001-02524-CCA-R3-CD, 2002 WL 31780718 (Tenn. Crim. App. Dec. 13, 2002, at Knoxville). Thus, the trial court erred in instructing the jury that the jury could convict the appellant upon a finding *inter alia* that he intentionally engaged in the conduct of shooting at the victim. However, as noted earlier, this error is subject to harmless error review to determine whether it can be said beyond a reasonable doubt that the error effected the outcome of the trial. <u>Page</u>, 81 S.W.3d at 789.

Turning to the question of harmless error with respect to the attempted first degree murder conviction it is readily apparent that unlike second degree murder, first degree murder requires that the *killing* be *premeditated*. This in turn means that in order for the jury to convict the appellant of attempted first degree murder in this case, the panel must have concluded beyond a reasonable doubt that the appellant "premeditated" or planned *to kill* Mr. Johnson. Under these circumstances, we believe that the erroneous instruction or intentional *conduct* was harmless beyond a reasonable doubt. <u>State v. Hill</u>, 2002 WL 31780718 at * *4-*5.

## Conclusion

After thoroughly reviewing the record before this Court, we conclude that there is reversible error and accordingly, the judgment of the trial court with respect to the conviction of attempted second degree murder is reversed and remanded for a new trial.

_____
JERRY L. SMITH, JUDGE