IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 20, 2002 Session

## STATE OF TENNESSEE v. ANTOINETTE HILL

**Appeal from the Criminal Court for Knox County**
**No. 69909      Richard R. Baumgartner, Judge**

---

**No. E2001-02524-CCA-R3-CD**
**December 13, 2002**

---

The defendant, Antoinette Hill, was convicted of first degree premeditated murder. The trial court imposed a life sentence. In this appeal of right, the defendant challenges the sufficiency of the evidence and argues that the trial court erred in its instructions to the jury. The judgment is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

Leslie M. Jeffress, Knoxville, Tennessee, for the appellant, Antoinette Hill.

Paul G. Summers, Attorney General & Reporter; Angele M. Gregory, Assistant Attorney General; and G. Scott Green and Robert Headrick, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

On December 12, 1998, the partly decomposed body of the victim, Stacy Robinson, was discovered in the Little River by a man competing in a fishing tournament. The hands of the victim had been bound with duct tape, which was also wrapped around her neck. Missing for some two weeks, her death was determined to have been caused by either manual or ligature strangulation.

The victim married Chivous Robinson in 1997 and they had one child, Sirrel, who was born on November 26, 1997. After the victim and Robinson separated in the spring of 1998, an action for divorce was filed. Later, Robinson and the defendant moved into the Forest Creek Apartments in Knoxville. On the date of her disappearance, the victim was scheduled to arrive at Robinson's apartment at about 4:30 to be present during his visitation with her one-year-old son.

Following the discovery of the body, the authorities questioned the defendant, who initially denied any knowledge about the disappearance of the victim. Police learned that Kelly Ann Jones,

a neighbor, had seen Chivous Robinson and the defendant in their apartment complex on the afternoon of November 29, 1998, the date the victim was last seen, carrying a large box, apparently filled with clothing. Ms. Jones, who had never before seen Robinson's son, Sirrel, thereafter saw him at the apartment on a regular basis. Connie Shipley, a Food City employee, recalled to police that just after 6:00 A.M. on a day shortly after Thanksgiving in 1998, a black male she later identified as Robinson acquired eight to ten rolls of duct tape.

On March 30, 1999, authorities again questioned the defendant about the murder of the victim. The defendant claimed that she had left the apartment she shared with Robinson when the victim and her son, Sirrel, arrived for visitation and that after staying with a neighbor for much of the day, returned to find the victim, who did not appear to be conscious, in a bedroom. She stated that Robinson explained that the two had gotten into an argument and that he had hit her or pushed her. During the questioning, the defendant acknowledged that she saw Robinson strangle the victim. She admitted helping place the body in a box, covering it with clothing, and then carrying it to the victim's car, which was located in the parking lot. The defendant stated that she was present as Robinson drove the car out Alcoa Highway and disposed of the body in Fort Loudon Lake. The defendant acknowledged that she and Robinson then went to a car wash and cleaned the car inside and out before leaving the car at a bus station.

Jennifer Grady, who lived in the Forest Creek Apartments across the hall from Robinson and the defendant, had been identified as a friend in the defendant's statement to police. At trial, Ms. Grady testified that two weeks prior to the murder, she overheard a conversation between the defendant and Robinson wherein Robinson, who stated that he was angry over being deprived of visitation rights with his son, remarked that the victim was going to "end up finding herself up in a river dead." Ms. Grady testified that the defendant indicated agreement with Robinson's statement. Ms. Grady testified that on the date of the murder, the defendant stayed at her apartment during Robinson's visit with his son and that at the defendant's request, she had periodically checked to see whether the victim had left. She recalled that during the course of the visitation, Robinson came to her apartment and visited with the defendant privately for about 10 minutes before returning to his own apartment. She stated that about half an hour later, the defendant sent her back to Robinson's apartment to ask Robinson to return to the Grady unit. When he did so, Ms. Grady overheard Robinson remark that he would "take care of it, to quit hassling him." When Ms. Grady visited the defendant's apartment a third time, she was told that the victim had left. Ms. Grady recalled that later that evening, Robinson came to her apartment to borrow some duct tape and that when she answered that she only had electrical tape, Robinson had commented that that would not work. Ms. Grady explained that when Robinson asked for the duct tape, the defendant, who was not feeling well, was lying down in Ms. Grady's back bedroom. She also recalled that during the course of the evening, the defendant telephoned her daughter's father, asking him to come pick up her daughter, Cierra, who was with her. Later, Robinson and the defendant asked Ms. Grady to watch Sirrel and to pick them up at the Greyhound bus station after they had finished their laundry at a nearby laundromat. Ms. Grady stated that a few minutes later, she saw Robinson and the defendant outside pulling a box with what appeared to be black curly hair inside; twenty minutes after that, the defendant was still carrying the box, but it was empty.

Ms. Grady said that she picked up Robinson and the defendant at the bus station at approximately 12:15 A.M. She described both as muddy and recalled that Robinson's shirt had black streaks. When she asked them whether they had gotten their laundry done, Robinson commented, "[W]e took care of business." Ms. Grady stated that after the November 29 incident, Sirrel was with Robinson and the defendant on a regular basis.

Tim Evans of the Knox County Sheriff's Department was present at the March 30, 1999, interview with the defendant. He witnessed the defendant confess to grabbing a belt that was already around the victim's neck and pulling the belt. According to the defendant, the victim struggled briefly.

Dr. Sandra Elkins, the Knox County Medical Examiner, performed an autopsy. She stated that the victim's thyroid cartilage in the front of the neck had been fractured and determined that strangulation was the cause of death. Dr. Murray Kevin Marks, a forensic anthropologist, assisted in the autopsy and described the fracture of the cartilage in the neck as indicative of compression from both the front and the sides of the neck.

At trial, the defendant acknowledged that Robinson, who did not testify, was upset about the limitations the victim had placed on visitation with his son. She claimed that she was at Jennifer Grady's apartment during the November 29, 1998, visitation and began to feel ill. She testified that an ex-boyfriend picked up her daughter, Cierra, and that at Robinson's request, she left Sirrel at Ms. Grady's apartment. She stated that when she returned to the apartment she shared with Robinson, the victim was lying face down in the bedroom floor, bound with tape around her wrists, ankles, and mouth. The defendant testified that Robinson explained that he had struck the victim during an argument and that her face was bruised. She recalled that the defendant placed a belt around the victim's neck and was preparing to choke her when there was a knock at the door; as he left to answer the door, he instructed her to "hold onto [the belt]" and "[m]ake sure that she doesn't make any noise." The defendant admitted holding the belt and, when the victim made noises, pulling the belt tight. The defendant testified that when the victim became quiet, she let go. She stated that when Robinson returned, he took the belt, braced his feet on the victim's back, and pulled until the victim quit moving. The defendant acknowledged that she helped Robinson hide the body in a box and carry it to the vehicle the victim had driven to the apartment. She admitted that they drove the vehicle to a lake, removed the body, and placed it in the lake. She testified that afterward, they washed the vehicle, disposed of the victim's clothing, and drove to a Greyhound bus station where Ms. Grady met them.

The defendant acknowledged that none of three prior statements she had made to police were entirely truthful. She explained that she felt threatened by the defendant and fearful that the police were going to arrest her. The defendant denied that her participation had caused the death of the victim.

I

Initially, the defendant claims that the evidence was insufficient to establish that she either killed the victim or that she acted with premeditation. She contends that the evidence of her level of involvement was not sufficient to establish that she was criminally responsible for the conduct of Chivous Robinson. While conceding that her participation qualified as facilitation to commit murder, she denies that the proof was sufficient to establish first degree premeditated murder.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

First degree murder includes, among other things, the premeditated and intentional killing of another. Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 1998). Premeditation is defined as follows:

> [A]n act done after the existence of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. . . . The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (Supp. 1998).

Tennessee Code Annotated section 39-11-402(2) provides that one may be criminally responsible for an offense committed by another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Criminal responsibility is not a separate or distinct crime but a theory by which a defendant's guilt may be established based upon the conduct of another. State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999).

In State v. Carson, 950 S.W.2d 951, 955 (Tenn. 1997), our supreme court interpreted the theory of criminal responsibility to include the pre-1989 Act concepts of aiders and abettors and accessories before the fact. No particular act establishes criminal responsibility for the conduct of

-4-

another. State v. Jones, 15 S.W.3d 880, 890 (Tenn. Crim. App. 1999). Presence during the commission of the crime or a relationship with the perpetrator of the crime before and after the commission of the offense are circumstances indicating guilt. State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998).

In this instance, the defendant confessed that she willingly assisted in the events which ultimately led to the death of the victim. By her own testimony, the defendant restrained the victim and, in fact, choked her as she lay bound and gagged on the floor, partially conscious, but struggling and apparently breathing. Afterwards, the defendant participated in disposing of the body and actively participated in covering up the crime. On at least three occasions, she lied when questioned by police. That the defendant pulled the belt harder as the victim struggled, so much so that she hurt her hand, establishes that she was guilty of first degree premeditated murder. In this instance, the defendant assisted in the commission of murder, assisted in the concealment of the crime, and aided Robinson in the disposal of the body. In our view, the evidence was sufficient. See Carson, 950 S.W.2d at 954.

II

Next, the defendant contends that the trial court erroneously instructed the jury in the definition of "intentional" as the necessary culpable mental state for first degree premeditated murder. She asserts that the instructions improperly lessened the state's burden of proof. Relative to this issue, the trial court instructed the jury as follows:

[t]o find the defendant guilty of this offense, as charged, the [s]tate must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) [t]hat the defendant unlawfully killed Stacy Robinson;
(2) [t]hat the defendant acted intentionally. A person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result; and
(3) [t]hat the killing was premeditated.

(Emphasis added.)

The defendant bases her argument on the holding in State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002), where Page, who was drunk, admitted striking the victim with a baseball bat but contended that he had no intention to kill. The defendant was convicted of second degree murder. The trial court's instructions to the jury defined "knowingly" to include a defendant's awareness (1) that his conduct is of a particular nature, (2) that a particular circumstance exists, or (3) that his conduct was reasonably certain to cause the result. Id. at 786. Interpreting our supreme court's holding in State v. Ducker, 27 S.W.3d 889 (Tenn. 2000), this court acknowledged that second degree murder qualifies as a result-of-conduct (rather than nature-of-conduct) offense wherein the defendant, in order to be guilty, must be aware that his or her conduct is reasonably certain to cause

death. Id. at 788. This court granted Page a new trial because the instructions improperly lessened the state's burden of proof by allowing the jury to convict on second degree murder based only upon awareness of the nature of the conduct or circumstances surrounding the conduct.

In Page, the circumstances were different than those here. Page was convicted of second degree murder. Although first and second degree murder are both result-of-conduct offenses, first degree murder differs from second degree murder in that the murder must not only be intentional, it must be premeditated. See Tenn. Code Ann. § 39-13-202(a)(1). By contrast, second degree murder is the knowing killing of another. Tenn. Code Ann. § 39-13-210. In Page, this court suggested that trial courts alter their instructions on premeditated first degree murder from the pattern instructions by deleting any reference to the nature of the defendant's conduct. 81 S.W.3d 1t 789.

Defendants, of course, have the right to accurate jury instructions. State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Any omission in the instructions in reference to an element of the offense which might lessen the burden of proof placed upon the state is constitutional error and requires a new trial unless the error is harmless beyond a reasonable doubt. State v. Walker, 29 S.W.3d 885, 893-94 (Tenn. Crim. App. 1999).

As indicated, the jury in this instance concluded that the defendant, either before the day of the offense or while engaged in the conduct of choking the victim, displayed a previously formed design or intent to kill. See State v. West, 844 S.W.2d 144, 147 (Tenn. 1992). The evidence was undisputed that the defendant committed acts that contributed to the death of the victim, helped dispose of the body, and fully cooperated in a coverup of the crime. Her relationship with Robinson and his son and her displeasure with the victim are circumstances establishing motive. That Robinson and the defendant achieved their desired result is irrefutable. In consequence, any error by the trial court in instructing in the disjunctive as to the mens rea required, including nature of the conduct, qualified as harmless beyond a reasonable doubt. The concern expressed by this court in the opinion in Page was that the jury was never given the opportunity to ascertain whether the defendant was aware that his conduct was reasonably certain to cause death. Here, the jury had determined that the defendant had a preconceived design to assist in the commission of the murder, thereby resolving the issue of intent to cause death favorably to the state.

Accordingly, the judgment is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE

-6-