IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 12, 2003 Session

# STATE OF TENNESSEE v. DOUGLAS MARSHALL MATHIS

**Appeal from the Circuit Court for Houston County**
**No. CR-4532     Robert E. Burch, Judge**

**No. M2002-02291-CCA-R3-CD - Filed March 3, 2004**

The defendant, Douglas Marshall Mathis, was convicted of first degree murder and sentenced to life imprisonment. In this appeal, he contends: (1) that the evidence is insufficient; (2) that the trial court erred by giving an irrelevant definition of "knowing" as a part of the instructions to the jury; (3) that the prosecutor's comments during closing argument were improper; (4) that he was denied the right to a fair and impartial jury; and (5) that the trial court erred by admitting certain evidence. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID G. HAYES, J., joined. GARY R. WADE, P. J., filed a dissenting opinion.

Jerred Creasy and Kirk Vandivort, Charlotte, Tennessee, for the appellant, Douglas Marshall Mathis.

Paul G. Summers, Attorney General & Reporter; Christine M. Lapps, Assistant Attorney General; Dan M. Alsobrooks, District Attorney General; and Carey J. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In May of 2001, the defendant, charged with first degree murder, entered a plea of guilt to one count of second degree murder for the shooting death of the victim, Selwyn Ward. Later, he filed a petition for post-conviction relief and in September 2001 the post-conviction court granted a new trial.

During the trial, Kenneth Barnes, Sheriff of Houston County, testified that shortly before midnight on May 11, 1999, he received a report of a shooting at a campsite near the Magnolia Bridge. Upon his arrival, Sheriff Barnes found the body of the victim, Selwyn Ward, who had suffered a shotgun wound to the face. The victim's wife, Kim Ward, informed the Sheriff that the

defendant had shot the victim after an argument. Ward admitted that she and her son, Cody Lucas, had moved the victim's body after the shooting.

While at the crime scene, Sheriff Barnes learned that the defendant, whom he had known for thirty years, had reported to the sheriff's department and wanted to make a statement. Because he was ill with the flu, the Sheriff was unable to participate in the entire interview but did recall that the defendant, who did not appear to be intoxicated, had claimed that the victim had brandished a weapon during their argument. During the questioning, the defendant acknowledged that he had thrown the murder weapon into the river.

Darrell Allison of the Houston County Sheriff's Department, the first officer to arrive on the scene, found that the victim was dead. At trial, he testified that he did not find any weapons at the scene. Later, Officer Allison learned that the defendant had admitted the shooting and told investigators that he had thrown the gun, which was never found, into a stream. Although Deputy Allison did not conduct an interview, he recalled that the defendant remarked, "Darrell, you . . . know I didn't mean to hurt this man."

David Hicks, criminal investigator for the Houston County District Attorney's Office, participated in the investigation. When he arrived at the crime scene, Hicks observed the shotgun wound to the victim and, along with Agent Joe Craig of the Tennessee Bureau of Investigation (TBI), interviewed the victim's wife and stepson. Hicks noted that there was a large pool of blood in front of a lounge chair near the campfire and that the victim's body had been moved. He testified that no weapons were found at the scene.

Hicks and Agent Craig also interviewed the defendant, who had turned himself in to the Houston County Sheriff's Department. According to Hicks, the defendant had been drinking but was not drunk. He recalled that the defendant claimed that he had gotten into an argument with the victim, who had then "gone to his tent and came back with a gun or what appeared to be a gun." Hicks maintained that it was the defendant's contention that he had backed up as far as he could and was in danger when he shot the victim. After questioning the defendant's brother, Hicks informed the defendant that he had received a conflicting account of the shooting and the defendant then admitted that the victim may not have had a weapon. According to the officer, the defendant acknowledged taking a twelve-gauge shotgun from under the seat, loading it with one six shot shell, positioning the barrel across the window, and firing one shot.

The victim's wife, Kim Ward, testified that her family had gone camping near Magnolia Bridge on the day of the murder. She recalled that shortly after 10:30 p.m., the driver of a large blue car paused on the bridge and then drove toward their campsite. When the car stopped near their campsite, two men got out and one announced, "It's Marshall Mathis and my brother Jeff." According to Ms. Ward, the victim then said, "[Y]our brother, Jeff, he's the one that sold my sixteen-year-old . . . son narcotics," to which the defendant replied, "[Y]ou're making a mistake." Shortly thereafter, Ms. Ward heard "a loud boom" and then saw the victim roll off of his chair and onto the ground. It was her opinion that the victim died within a few seconds. Ms. Ward testified that she

sent her son, Cody Lucas, for help while the defendant and his brother sped away. She contended that the victim was unarmed at the time of the shooting.

During cross-examination, Ms. Ward admitted that she did not see who fired the shot that killed the victim. While she was unable to identify the defendant as the driver of the car, she maintained that she saw his arm extending outside of the driver's side window. She conceded, however, that she did not see a gun. Ms. Ward acknowledged that the distance from where the defendant's car stopped to where the victim was sitting was approximately forty-three feet. She also remembered that the defendant had stated that he was drunk. Ms. Ward explained that after the shooting, she and her son, Cody, had moved the body because the victim's feet were too close to the fire.

Cody Lucas, the victim's stepson, testified that he had been expelled from school shortly before the shooting because he had taken Valium to school. He claimed that he acquired the pills from the defendant's brother, Jeff Mathis, and that the victim was upset about the incident. He recalled that on the day of the shooting, the family had awakened early, gathered their camping gear, and driven to White Oak Creek for a day of fishing and swimming. Lucas testified that when he returned to his tent at approximately 10:45 p.m., the victim and his mother were sitting by the fire. He stated that he had only slept for about fifteen minutes when he heard a gunshot. He remembered that when he stepped out of his tent, he saw "a car taking off at the top of the driveway and my dad laying there and my mom crying." Lucas recalled that he drove the family van to a nearby residence to telephone 911.

Kimberly Agee, a friend of the victim, testified that she and her children had joined the victim and his children at the campsite on the day of the murder. She recalled that the children played and swam in the creek while the defendant caught fish for the evening meal. According to Ms. Agee, the victim was "laid back in his recliner or lounge chair by the camp fire, just relaxing" when she left the campsite at approximately 10:45 p.m. She testified that she saw no gun in the victim's possession.

Jeff Mathis, the defendant's brother, testified that he and the defendant had traveled to Waverly on the evening of the shooting and, as they returned home, had to cross Magnolia Bridge. He recalled that when they reached the bridge, the defendant first directed him to stop the vehicle and then asked him to drive down to the creek. He stated that when they arrived at the campsite, the defendant identified himself to the victim, explaining that his brother was with him, at which point the victim replied, "[Y]our little brother, Jeff, has sold my sixteen-year-old son some cocaine." Jeff Mathis testified that an argument ensued and the defendant, who was sitting in the passenger seat, pushed him out of the way and shot the victim with a sawed-off, twelve-gauge shotgun. According to Jeff Mathis, the defendant remarked, "[I]f I had another gun or could get this shell out, . . . I'd kill her and him, too." Jeff Mathis testified that he drove the defendant to the residence they shared with their parents and the defendant shouted, "Daddy, get up, . . . I've killed a man[!]"

During cross-examination, Jeff Mathis conceded that he had initially claimed that the defendant was unarmed on the day of the shooting, explaining that he had done so because he was on parole at the time. He also acknowledged that the victim sounded angry when he accused him of selling drugs to his son and that he was scared because "[y]ou can't ever tell what a man's got when he's camped out." Jeff Mathis testified that the defendant did not take aim before shooting the victim and simply fired out the window of the car.

Before the Sheriff arrived to question the defendant, J.T. Baggett, a member of the Drug Task Force in Houston County, stood guard. Officer Baggett testified that the defendant was on the front steps of the police station when he arrived and appeared to be nervous. While the officer did not participate in the interview of the defendant, he recalled that the defendant claimed that he did not intend to shoot the victim and that he had done so in self-defense. He also heard the defendant acknowledge that he would have to "face the consequences of going to jail for his actions." Baggett testified that the defendant did not appear to be intoxicated.

TBI Agent Joe Craig testified that the defendant initially claimed self-defense, maintaining that the victim had walked out of his tent with something in his hand that resembled a gun. The agent recalled that when the defendant was confronted with the contradictory statement given by his brother, he stated that the victim had been sitting in the chair when they arrived and appeared to have something in his hands. According to Agent Craig, officers from the Tennessee Highway Patrol lowered a camera into the river at the location where the defendant claimed to have disposed of the gun but were unable to locate the weapon. He explained that the current was too strong to permit divers to go into the area to search.

During cross-examination, Agent Craig acknowledged that during his investigation, he failed to discover any previous conflicts between the defendant and the victim. He recalled that the defendant had insisted that the only reason he traveled to the camp site at Magnolia Bridge was to "sleep off" the alcohol he had drunk earlier in the evening, implying a chance meeting with the victim. Agent Craig also agreed that there were no holes in the lounge chair where Ms. Ward claimed that the victim had been sitting at the time of the shooting. He acknowledged that he was unable to conclusively determine whether the victim was standing or seated when he was shot.

Dr. Charles Harlan, who performed the autopsy, testified that the cause of death was a shotgun wound. He found pellet wounds from the victim's shoulders to his head and determined that some of the pellets from the shotgun blast had altogether missed the victim, suggesting the lack of a precise aim. Dr. Harlan was unable to find wadding in any of the wounds, indicating that the shot was not fired from an especially close range.

I

Initially, the defendant challenges the sufficiency of the evidence for a first degree murder conviction, arguing that the state failed to establish the element of premeditation. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

First degree murder is described as:

(1) A premeditated and intentional killing of another;
(2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy; or
(3) A killing of another committed as a result of the unlawful throwing, placing or discharging of a destructive device or bomb.

Tenn. Code Ann. § 39-13-202(a) (Supp. 1999). Tennessee Code Annotated section 39-13-202(d) provides that:

[P]remeditation is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (1997). Whether the evidence was sufficient depends entirely on whether the state was able to establish beyond a reasonable doubt the element of premeditation. See State v. Sims, 45 S.W.3d 1, 7 (Tenn. 2001); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

Our supreme court has held that the presence of premeditation is a question for the jury and may be inferred from the manner and circumstances of the killing. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Moreover, it is well-established that premeditation may be proved by circumstantial evidence. See, e.g., State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). Our high court has identified a number of circumstances from which the jury may infer premeditation: (1) the use of a deadly weapon upon an unarmed victim; (2)

the particular cruelty of the killing; (3) the defendant's threats or declarations of intent to kill; (4) the defendant's procurement of a weapon; (5) any preparations to conceal the crime undertaken before the crime is committed; (6) destruction or secretion of evidence of the killing; and (7) a defendant's calmness immediately after the killing. See State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); Pike, 978 S.W.2d at 914-15. This list, however, is not exhaustive and serves only to demonstrate that premeditation may be established by any evidence from which the jury may infer that the killing was done "after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d); see Pike, 978 S.W.2d at 914-15; Bland, 958 S.W.2d at 660.

One learned treatise states that premeditation may be inferred from events that occur before and at the time of the killing:

> Three categories of evidence are important for [the] purpose [of inferring premeditation]: (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, planning activity; (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and (3) facts about the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

2 Wayne R. LaFave, Substantive Criminal Law § 14.7(a) (2d ed. 2003) (emphasis in original).

Here, the proof at trial established that once at the campsite, the defendant had an unpleasant exchange of words with the victim apparently over the question of whether Jeff Mathis had sold drugs to Mr. Ward's son. The defendant admitted in his statement to police that he took time to reach for the homicide weapon, load it, and aim in the direction of the victim. Although he claimed to police that he did so only to scare the victim or to defend himself, the jury was free to infer otherwise. Further, Jeff Mathis testified that after shooting the victim in the face, the defendant remarked that he would kill Ms. Ward if he had an additional shell, possibly implying an intent to have caused harm to the victim. Finally, the defendant hurriedly left the scene before the incident was reported to the Sheriff and disposed of the murder weapon by throwing it into a river. Taken in the light most favorable to the state, there was sufficient evidence to support a finding of premeditation.

II

The defendant next asserts that the trial court erred by providing an irrelevant definition of "knowing" in its instructions to the jury. The state asserts that the issue is moot because the defendant was convicted of first degree murder.

The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); see also Tenn. R. Crim. P. 30. "[The] defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793

S.W.2d 236, 249 (Tenn. 1990). Our law requires that all of the elements of each offense be described and defined in connection with that offense. See State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989). Jury instructions must, however, be reviewed in the context of the overall charge rather than in isolation. See Sandstrom v. Montana, 442 U.S. 510 (1979); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). Any omission in the instructions in reference to an element of the offense which might lessen the burden of proof placed upon the state is constitutional error and requires a new trial unless the error is harmless beyond a reasonable doubt. State v. Walker, 29 S.W.3d 885, 893-94 (Tenn. Crim. App. 1999).

In State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002), a panel of this court held that because second degree murder is a result-of-conduct offense, the trial court erred by including the nature-of-conduct and nature-of-circumstances[1] definitions of knowingly in its charge to the jury. Further, the panel determined that the error could not be classified as harmless beyond a reasonable doubt because the defendant's mental state was a contested issue at trial. Id. at 789-90.

As indicated, the defendant was convicted of first degree premeditated murder, which requires a determination by the jury that he acted intentionally. In State v. Hill, 118 S.W.3d 380 (Tenn. Crim. App. 2002), the defendant, who was convicted of first degree murder, complained that the trial court erroneously provided the nature-of-conduct definition of intentionally. A panel of this court concluded that the trial court should not have provided the nature-of-conduct definition of intentional because first degree premeditated murder, like second degree murder, is a result-of-conduct offense. The panel ruled, however, that because the defendant had been convicted of first degree murder, which requires a finding that the defendant acted with premeditation, the error could be classified as harmless beyond a reasonable doubt. Id. at 386.

By its verdict, the jury in this instance concluded that the defendant acted with premeditation. That is to say that he displayed a previously formed design or intent to kill. See State v. West, 844 S.W.2d 144, 147 (Tenn. 1992); Hill, 118 S.W.3d at 386. Implicit in a finding of premeditation is that it was the defendant's desire to cause the result of his conduct, i.e., the death of the victim. Because the jury determined that the defendant acted with the design to kill, it is our view that the inclusion of the nature-of-conduct definition of intentional would be harmless beyond a reasonable doubt. See Hill, 118 S.W.3d at 386. Additionally, it is our view that a finding of premeditation encompasses a finding that the defendant acted knowingly. In consequence, any error with regard to the definition of knowing would qualify as harmless beyond a reasonable doubt. See id.; see also Page, 81 S.W.3d at 789.

---

[1] "[A] person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-302(b).

III

The defendant complains that various statements made by the prosecutor during rebuttal argument amounted to prosecutorial misconduct. Specifically, the defendant complains that the prosecutor expressed to the jury his personal opinion that the prosecution witnesses were truthful, and that the prosecutor made other statements designed to arouse the passions of the jury and stigmatize defense counsel. See State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (setting forth categories of improper argument).

The State has correctly noted that the defendant failed to lodge a contemporaneous objection to any of the comments about which he complains on appeal. Moreover, the defendant failed to raise this issue in this motion for a new trial. Typically these omissions result in a waiver on appeal of any complaint concerning the prosecutor's comments. Tenn. R. Crim. P. (3)(e) and 36 (a); State v. Thornton, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999); State v. Green, 947 S.W.2d 186, 188 (Tenn. Crim. App. 1997); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992). Thus, if this Court is to review the claims of prosecution misconduct we must do so through the process of "plain error" review embodied in Tenn. R. Crim. P. 52(b) which provides:

> An error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice.[2]

This Court has, in its discretion, from time to time reviewed allegations of prosecutorial misconduct as "plain error" even in the absence of a contemporaneous objection. See, e.g., State v. Marshall, 870 S.W.2d 532 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Carter, 988 S.W.2d 145 (Tenn. 1999) (determining in absence of objection that prosecutor's jury argument was not plain error); State v. Bulter, 795 S.W.2d 680 (Tenn. Crim. App. 1990) (considering whether statements of prosecutor were plain error despite lack of objection by defendant); Anglin v. State, 553 S.W.2d 616 (Tenn. Crim. App. 1977) (determining that in order to justify reversal on the basis of improper argument and remarks of counsel in absence of objection, it must affirmatively apper that the improper conduct affected the verdict to the prejudice of the defendant).

In exercising our discretion as to whether plain error review under Tenn. R. Crim. P. 52(b) is appropriate the Tennessee Supreme Court has directed that we examine five factors, all of which must be present in a case in order for review under Rule 52(b) to be appropriate. These five factors are as follows: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the defendant must have

---

[2]This rule by its terms allows plain error review only where there is a failure to allege error in the new trial motion or where the error is not raised before the appellate court. Nevertheless the rule has been interpreted by the appellate courts to allow appellate review under some circumstances in the absence of a *contemporaneous objection* as well.

been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000) (citing State v. Adkisson, 899 S.W.2d 626, 641 (Tenn. Crim. App. 1994)).

For a "substantial right" of the accused to have been affected, the error must have prejudiced the appellant. In other words, it must have affected the outcome of the trial court proceedings. United States v. Olano, 507 U.S. 725, 732-37 (1993) (analyzing the substantially similar Fed. R. Crim. P. 52(b)); Adkisson, 899 S.W.2d at 642. This is the same type of inquiry as the harmless error analysis under Tenn. R. App. P. 36(b), but the appellant bears the burden of persuasion with respect to plain error claims. Olano, 507 U.S. at 732-37.

In the instant case we are not persuaded that the defendant has successfully carried his burden of persuasion in establishing a plain error claim. First, the record is clear as to what happened in the trial court. Following defense counsel's closing argument calling into question the veracity of Ms. Ward's and Jeff Mathis' accounts of the shooting, the prosecutor, rather unartfully, argued that Ms. Ward was indeed credible. He also argued that Jeff Mathis should be believed despite the fact that he was a "no-count" because his testimony had been corroborated. Although the manner in which these points were made arguably crosses the line into improper expressions of opinion or personal belief as to the credibility of witnesses, it is not clear that a clear and unequivocal rule of law has been breached. What is or is not improper rebuttal argument may very well vary depending on the context in which it was made. See Judge, 539 S.W.2d at 343 (Tenn. Crim. App. 1976)(holding that propriety of prosecution comments must be evaluated in light of whether they were in direct response to defense argument rather than gratuitous. See also Goltz, 111 S.W.3d at 6. The same might be said of the prosecutor's remarks commenting on the good work of law enforcement in this case. These were made in direct response to defense arguments that the police work was inadequate in this case through an alleged failure to preserve the crime scene.

Next it is impossible to say whether the complained of comments adversely affected the jury's verdict in this case and whether consideration of this issue is necessary to do substantial justice. It should be noted again that the burden of persuasion on appeal is on the defendant to demonstrate that the prosecutor's comments "more probably than not affected the judgment or would result in prejudice to the judicial process." Olano, 507 U.S. at 732-37; Tenn. R. App. P. 36(b). Other than the bare assertion that the prosecutor's comments deprived the defendant of a fair trial, there is no indication that the jury was unduly swayed from its duties as explained in the jury instructions.

Finally, and perhaps most importantly, there is no excuse or explanation proffered by the defendant either in the record or in his brief on appeal as to the reason for his failure to object to the allegedly offending comments or his failure to raise this issue in his motion for a new trial. Thus, we cannot say that the failure to object was for reasons other than tactical.

Under these circumstances we are of the opinion that the defendant has failed to carry his burden of persuasion in convincing this Court to consider as plain error the propriety of the allegedly improper comments of the prosecutor in closing rebuttal. This issue is therefore waived.

IV

The defendant contends that he was denied the right to a fair and impartial jury, see U.S. Const. Art. VI, because the jurors were permitted to see and interact with the victim's children. Initially, the defendant has failed to support this issue with argument or citation to authorities. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7); State v. Hammons, 737 S.W.2d 549, 552 (Tenn. Crim. App. 1987). Accordingly, the defendant has waived our consideration of this issue. Further, the defendant is not entitled to relief.

The record established that the state initially requested that the children be permitted to sit in the audience and observe the trial. The trial court granted the request but stated that it would grant a mistrial if the jury's attention was, in any way, drawn to the children. The state then decided that the children should not be present in the courtroom and sent them into the hall to await transportation from the courthouse. They sat on the stairs just outside the door used by the jury to exit the courtroom. There was no proof that the state intentionally placed the children on the stairs to garner sympathy from the jury. Moreover, there is absolutely no evidence that the jury was made aware that the children were those of the victim or that the jury interacted with the children at any time. In consequence, the defendant is not entitled to relief.

V

Finally, the defendant cites a number of errors with regard to the sawed-off shotgun admitted for demonstrative purposes. Specifically, he claims that the shotgun should not have been admitted for any purpose and that the trial court erred by using the term "murder weapon" when explaining the purpose of the admission of the weapon to the jury.

At trial, the state sought admission of a sawed-off shotgun procured from the TBI crime lab for demonstrative purposes, arguing that it was important for the jury to see how the weapon was broken and how it was loaded. The defendant objected, stating that the mechanics of a weapon other than that used in the shooting was irrelevant. The trial court admitted the shotgun for demonstrative purposes only. The admission of demonstrative evidence is within the sound discretion of the trial court. State v. West, 767 S.W.2d 387 (Tenn. 1989); State v. Delk, 692 S.W.2d 431 (Tenn. Crim. App.1985); State v. Wiseman, 643 S.W.2d 354, 365 (Tenn. Crim. App. 1982). In our view, the trial court did not abuse its discretion in admitting the weapon. Moreover, the trial court instructed the jury that the shotgun was not that used in the shooting and was to be used only for demonstrative purposes. The jury is presumed to follow the instructions of the court. See State v. Smith, 893 S.W.2d 908, 914 (Tenn. 1994); State v. Woods, 806 S.W.2d 205, 211 (Tenn. Crim. App. 1990). Thus, any error would qualify as harmless. See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

The defendant correctly points out that the trial court used the term "murder weapon" in its instructions to the jury regarding the admission of the shotgun. When the error was brought to the court's attention, however, it issued an immediate curative instruction. As indicated, this court will presume that the jury followed the instruction. See, e.g., Smith, 893 S.W.2d at 914. The error would be harmless.

## Conclusion

Based on the foregoing, the judgment of the trial court is AFFIRMED.

_____
JERRY L. SMITH, JUDGE