IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 7, 2004

## STATE OF TENNESSEE v. STEVEN NELORN HAMPTON, JR.

**Direct Appeal from the Circuit Court for Marshall County**
**No. 15680     Charles Lee, Judge**

_____

**No. M2004-00704-CCA-R3-CD** - Filed March 24, 2005

_____

Following a jury trial, Defendant, Steven Nelorn Hampton, Jr., was found guilty in count one of especially aggravated robbery, a Class A felony, and in count two of burglary of an automobile, a Class E felony. The trial court sentenced Defendant to concurrent sentences of twenty years for the especially aggravated robbery conviction and one year for the burglary conviction. Following a hearing on Defendant's motion for new trial, the trial court, acting in its capacity as thirteenth juror, found that the jury's verdict of guilty on the automobile burglary charge was contrary to the weight of the evidence and set aside Defendant's conviction for this offense. The trial court denied Defendant's motion for a new trial on the especially aggravated robbery conviction. On appeal, Defendant challenges the sufficiency of the evidence supporting his conviction of especially aggravated robbery and the length of his sentence. After a review of the record in this matter, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

John H. Richardson, Jr., Fayetteville, Tennessee, for the appellant, Steven Nelorn Hampton, Jr.

Paul G. Summers, Attorney General and Reporter; Preston Shipp, Assistant Attorney General; William Michael McCown, District Attorney General; and Weakley E. Barnard, Assistant District Attorney General, for the appellee, the State of Tennessee.

### OPINION

### I. Background

Shanna Morales, an assistant manager at a Papa John's Pizza in Lewisburg, answered the telephone at work at approximately 10:10 p.m. on April 26, 2003. The caller identified himself as "Mr. Wallace" and placed an order for two pizzas. Ms. Morales asked the caller for his telephone

number.  Another individual came on the line and said that he did not have a telephone.  Ms. Morales said that she thought the callers were young by the sound of their voices.

Ms. Morales gave the two pizzas to the victim, Thomas Harper, and told him to deliver them to 720 Park in Lewisburg as requested by the caller.  Ms. Morales said that she felt uneasy about the situation and told Mr. Harper to be careful.  As a precaution, Mr. Harper left all but fifty dollars of the money he had collected that night from customers at the restaurant.  Mr. Harper said that he also had about thirty dollars in cash of his own money and a cell phone.  Mr. Harper reached Park Avenue about one minute after he left the store but could not find number 720.  He drove to the end of the street and turned around.  When he drove back up the street, a young man waved him down, and pointed to a two-story house which sat about twenty feet back from the street.  There were no lights on in the house.

The young man told Mr. Harper that his father was on the front porch with the money to pay for the pizzas.  Mr. Harper approached the man on the front porch and observed that he was much bigger than the first young man.  Mr. Harper pulled the pizzas out of the delivery bag and handed them to the smaller man.  He heard a sharp sound "like a rifle had gone off" and then lost consciousness.  Mr. Harper woke up three or four minutes later, lying face down in the grass in front of the house.  Mr. Harper's wallet and cell phone were gone, and his car had been "rifled through."  The fifty dollars from the customer proceeds was still in his front pants pocket.  Mr. Harper felt blood running down his face and thought he had been shot.  He managed to drive back to Papa John's where he collapsed.  Ms. Morales called 911.  Mr. Harper said that the doctor at the hospital later told him he had been struck over the head by something similar to a baseball bat.  Mr. Harper was still suffering from the aftereffects of his injury at the time of the trial.

Sergeant Steven Woodward and Detective Kevin Patin with the Lewisburg Police Department investigated the offense.  Sergeant Woodward said that there were two or three abandoned houses at the beginning of Park Street, including the house where the offense occurred.  Sergeant Woodward found a fire poker with a broken handle and an empty Papa John's pizza bag next door at 724 Park Street.  The victim's wallet was found about forty to fifty feet from the pizza bag.

Detective Patin, acting on information received from the school resources officer for the Lewisburg Middle School, interviewed thirteen-year-old Marcus Cross who confessed to his participation in the robbery.  Based on Mr. Cross' statement, Sergeant Patin interviewed eighteen-year-old Jonathan Harris, thirteen-year-old Josh Bailey, seventeen-year-old Jordan Fitzgerald, and Defendant, who was nineteen years old .  All five admitted to some participation in the robbery.  Sergeant Patin said that Defendant admitted that he placed the call to Papa John's; Mr. Harris admitted that he struck Mr. Harper in the head with a fireplace poker and then searched his clothes; Mr. Bailey said that he flagged down Mr. Harper and grabbed the pizzas before Mr. Harper was struck; and Mr. Cross said that he searched through Mr. Harper's car.  After the robbery, the five perpetrators went to a friend's house and shared the pizza.  Mr. Harris gave each of the men a few dollars and then bought marijuana with the remainder of Mr. Harper's money.

Defendant's statement to Detective Patin was read to the jury as follows:

On April 26, 2003, me and Johnathan [sic] [Harris], Jody [Fitzgerald], Marcus [Cross], Josh [Bailey], Shane [Greer] and some others were shooting ball at the kiddie park. Then we went to Shane's house to watch the ball game, Sacramento Kings vs. Utah. Marcus said something about ordering some pizza. Marcus asked me to go with him to call in the pizza. We went across the street to use the phone. I dialed the phone because I knew the number. Then gave it to Marcus. He said his name was "Wallace." He kept messing up the order so I got on the phone. The lady asked for my first name so I made up the name Tim. Marcus told me where to have the pizza sent to. I ordered, then we went back to Shane Greer's house. Marcus said, we did it, we ordered it. Will be here in thirty to forty minutes. We waited a little bit. Then we left and followed Marcus to where the pizza was to be delivered. Josh went to the road to flag him down (pizza man). Johnathan was sitting on the steps. Marcus was hiding in the building. I was hiding behind the house. I don't know where Jody was hiding. When the pizza man pulled in, Johnathan hit him in the head, and he fell to the ground, and Josh ran off with the pizza's [sic]. After Johnathan hit him, I stepped toward him in shock that he hit him. Johnathan search[ed] him. Marcus went to the pizza man's car. I don't know what Jody did but he was there close. We ran across the park back to Shane's house. We all ate pizza. I ate two slices, then Johnathan gave me $5.00 [be]cause I was with him when it happened. I don't know how much money everybody else got.

Jonathan Harris testified that Mr. Cross asked him if he wanted to rob a pizza delivery driver. Mr. Harris said they should wait and see what the others said. The group gathered at Shane Greer's house that evening to watch a basketball game on television. Mr. Cross posed his plan to the group, and everyone agreed to participate. Mr. Cross, Mr. Bailey, and Defendant went to another friend's house and called Papa John's to order some pizza. The men continued to watch basketball for about twenty-five minutes, and then went over to 720 Park Street, the address given to Papa John's. As they left Mr. Greer's house, Mr. Harris said that he grabbed the fireplace poker and put it down his pants leg. Mr. Harris said that Defendant saw him take the poker.

Mr. Harris said that Mr. Cross, Defendant and Mr. Fitzgerald hid in the abandoned house next door. After Mr. Bailey took the pizzas from the victim, Mr. Harris swung the poker at Mr. Harper's head. Mr. Harris said he took Mr. Harper's wallet, Mr. Fitzgerald took the cell phone, and Mr. Cross searched Mr. Harper's car. Mr. Harris said that Defendant was standing next to him. Mr. Harris told Defendant that he did not have to search Mr. Harper because he had already taken the victim's wallet.

Mr. Harris said that no one checked to see if Mr. Harper was alive before they left. Mr. Harris admitted that the men enjoyed the pizzas. He gave Mr. Cross and Mr. Bailey each one dollar, and gave Mr. Fitzgerald and Defendant five dollars each. Mr. Harris said that he bought some marijuana with the rest of Mr. Harper's money.

On cross-examination, Mr. Harris said that he agreed to testify against Defendant as part of his plea agreement to the charge of especially aggravated robbery. Mr. Harris said that he lied in his first statement to the police when he said that Defendant hit Mr. Harper and took his money. Mr. Harris said that Defendant's role was limited to calling in the order for pizza. Mr. Harris was not sure if Defendant saw him take the fire poker to 720 Park Street, but said that Defendant participated in the plan to rob the delivery driver.

Mr. Bailey said that he, Defendant, Mr. Harris, Mr. Cross, Mr. Bailey and Mr. Fitzgerald met at Mr. Greer's house before the robbery, and that everyone participated in the discussion about robbing the pizza delivery driver. Mr. Bailey said that Defendant was supposed to wait in the house next door until Mr. Harris called out to him. He said initially Defendant was supposed to hit the victim, but Mr. Harris ended up doing it. Mr. Bailey said that he did not know Mr. Harris was armed with a fire poker.

## II. Sufficiency of the Evidence

Relying on this Court's decision in *State v. Boxley*, 76 S.W.3d 381 (Tenn. Crim. App. 2001), Defendant argues that the accomplices' testimony was insufficiently corroborated to support his conviction. That is, none of the witnesses other than the accomplices could identify Defendant as a participant in the robbery.

It is well settled that "'a conviction may not be based solely upon the uncorroborated testimony of an accomplice.'" *Boxley*, 76 S.W.3d at 386 (quoting *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). The proof necessary to corroborate the accomplice's testimony must include "some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity." *Shaw*, 37 S.W.3d at 903 (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)).

In *Boxley*, three men were involved in an attempted robbery which resulted in the shooting death of one of the victims. Two of the men confessed to their involvement in the crime and implicated the defendant as a participant in the aborted robbery. Although the State's witnesses could corroborate the accomplices' testimony as to "the time the crime occurred, the type vehicle used, the manner in which the offense was committed, and the number and race of persons present," none of the State's evidence "relate[d] to the identity of the defendant." *Boxley*, 76 S.W.3d at 387. "It is not enough to simply corroborate that a crime has been committed in a manner described by the accomplices." *Id.* (citing *Shaw*, 37 S.W.3d at 903). Based on the facts presented in *Boxley*, this Court concluded that the evidence was insufficient to corroborate the defendant's participation in the crime.

In the present case, none of the State's witnesses other than Defendant's accomplices could provide eyewitness testimony that Defendant was a participant in Mr. Harper's robbery. Mr. Harper

testified that a young man flagged him down after he passed 720 Park Street and that a larger man was sitting on the front steps of the abandoned house. Mr. Harper said that he handed the pizzas to the smaller man and then was struck over the head. He could not identify any of the perpetrators. In this case, however, unlike *Boxley*, Defendant's statement to the police, which was read into the evidence by Officer Patin, sufficiently corroborated the accomplices' testimony regarding Defendant's involvement in the offense. *See State v. Anderson*, 985 S.W.2d 9, 16-17 (Tenn. Crim. App. 1997).

The State proceeded under a theory of criminal responsibility to establish Defendant's guilt. *See State v. Hill*, 118 S.W.3d 380, 384 (Tenn. Crim. App. 2002). An accused may be criminally responsible for an offense committed by another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2). "Criminal responsibility is not a separate or distinct crime but a theory by which a defendant's guilt may be established based upon the conduct of another." *Hill*, 118 S.W.3d at 384 (citing *State v. Lemacks*, 966 S.W.2d 166, 170 (Tenn. 1999)).

Defendant admitted that he shared in the proceeds of the robbery. *See State v. Harris*, 30 S.W.3d 345, 354 (Tenn. Crim. App. 1999). In addition, Defendant was present at the scene of the crime, and was with the group of young men both before and after the commission of the crime. See *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). Defendant admitted that he placed the telephone call that lured Mr. Harper to the abandoned house on Park Street. Defendant's theory of defense at trial was based on his ignorance that a crime was going to be committed. The resolution of this issue, however, depended upon the jury's assessment of the credibility of the witnesses. Viewing the evidence in the light most favorable to the State, we conclude that the evidence was sufficient for a rational jury to find beyond a reasonable doubt that Defendant knew that the group intended to commit a robbery, and that Defendant acted with the intent to promote the commission of the offense and knowingly furnished substantial assistance. Defendant is not entitled to relief on this issue.

Defendant argues for the first time on appeal that his indictment was fatally defective because it failed to charge the facts supporting the enhancement factors which were used by the trial court in determining the length of his sentence. *See Wyatt v. State,* 24 S.W.3d 319, 325 (Tenn. 2000)("A defendant may make jurisdictional challenges to an indictment at any stage of the proceeding, Tenn. R. Crim. P. 12(b). . ."). Defendant bases his argument on Justice Breyer's dissenting opinion in *Blakely v. Washington*, 542 U.S. ___, 124 S. Ct. 2531, 2561, 159 L. Ed. 2d 403 (2004) (Breyer, J., dissenting). As discussed in greater detail below, the *Blakely* court concluded that "'[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt,'" whether the State terms the fact an element or a sentencing factor. *Blakely*, 124 S. Ct. at 2536 (*quoting Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63, 147 L. Ed. 2d 435 (2000)). In his dissenting opinion, Justice Breyer warned in dicta that the majority's opinion had the potential effect of forcing the State to charge in an indictment not only the facts supporting the elements of

the crime, but also all the relevant facts supporting sentencing enhancement factors, resulting in what Justice Breyer termed the "17-element" crime. *Blakely*, 124 S. Ct. at 2555-2562. Be that as it may, although *Blakely* calls into question certain aspects of our sentencing scheme, the decision cannot be read to require the State to charge the facts supporting application of possible sentencing factors in an indictment in addition to the elements of the offense. Our Supreme Court recently reiterated that the Fourteenth Amendment has not been construed to impose the Fifth Amendment right to presentment or grand jury indictment upon the states. *State v. Berry*, 141 S.W.3d 549, 560 (Tenn. 2004) (quoting *Ring v. Arizona*, 536 U.S. 584, 597 n.4, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002)); *see also State v. Holton*, 126 S.W.3d 845, 863 (Tenn. 2004). Defendant does not otherwise challenge the form or sufficiency of the indictment against him, and is not entitled to relief on this issue.

## III. Sentencing Issues

At the sentencing hearing, Defendant testified that he did not have any previous history of criminal behavior and did not use drugs or alcohol. Defendant continued to deny that he knew that a robbery was going to occur that night. On cross-examination, Defendant conceded that he knew something was going to happen but still maintained that he did not know what that "something" was. Defendant said that the pre-sentence report erroneously reflected that he had used drugs "up until this year." Defendant also said that his statement was wrong about his involvement in the offense. Defendant denied that he did anything other than place the telephone call to Papa John's and that he ate two slices of pizza after the robbery. He maintained that Mr. Harris lied when he said that he discussed the robbery with Defendant.

Defendant conceded that he had been arrested for domestic violence in 2002 in Alabama. He said that he was placed on probation for eighteen months as a result of his conviction for this offense.

Bonita Wheeler, Defendant's mother, said that Defendant moved to Tennessee from Alabama in October, 2002, to live and work with his father. She said that Defendant was charged with domestic violence following an altercation with his step-father in August or September, 2002. Ms. Wheeler said that Defendant pled guilty and was placed on probation for eighteen months.

At the conclusion of the testimony, the trial court found that Defendant was a leader in the commission of the offense under enhancement factor (3). Tenn. Code Ann. § 40-35-114(3). The trial court also considered Defendant's prior domestic violence conviction and the extent of the victim's injuries, but assigned these enhancement factors little weight. *See id.* §§ 40-35-114(3) and (7). The trial court also considered enhancement factor (9), the defendant has a previous history of unwillingness to comply with the terms of a sentence involving release into the community, based on Defendant's and Ms. Wheeler's testimony that Defendant was on probation when the offense was committed. *Id.* § 40-35-114(9).

We note initially that enhancement factor (9) is applicable only upon a finding that a defendant has, *prior* to the commission of the crime for which he is being sentenced, shown an unwillingness to comply with the terms of a sentence involving release into the community and does not apply merely upon a finding that the defendant was on probation at the time of the current offenses. *State v. Adams*, 45 S.W.3d 46, 62 (Tenn. Crim. App. 2000).

The trial court found as a mitigating factor that Defendant, because of his youth, lacked substantial judgment in committing the offense. *Id*. § 40-35-113(6). The trial court found that the mitigating factor outweighed the applicable enhancement factors and sentenced Defendant to the presumptive sentence for a Class A felony, twenty years.

When a defendant challenges the length, range, or manner of service of a sentence, this Court conducts a *de novo* review with a presumption that the determinations made by the trial court are correct. *Id.* § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. *Id*. §§ 40-35-102, -103, and -210; *State v. Smith*, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

As a Range I offender convicted of a Class A felony, Defendant is subject to a sentence of between fifteen and twenty-five years. Tenn. Code Ann. § 40-35-112(a)(2). In calculating the sentence for a Class A felony conviction, the presumptive sentence is the midpoint of the range, twenty years, if there are no enhancement or mitigating factors. *Id.* § 40-35-210(c). If there are enhancement but no mitigating factors, the trial court may set the sentence above the midpoint of the range, but still within the range. *Id.* § 40-35-201(d). If both enhancing and mitigating factors are present, the trial court must start at the midpoint of the range, enhance the sentence within the range as appropriate for the enhancing factors, and then reduce the sentence as appropriate for the mitigating factors. *Id.* § 40-35-210(e). If there are mitigating but no enhancement factors present, then the trial court may set the sentence either at the midpoint of the sentencing range, or below the midpoint.

Defendant argues that the trial court erred under *Blakely* when it applied enhancement factor (3) in determining the length of his sentence. Defendant contends that the maximum sentence he

can received under *Blakely* is fifteen years, or the bottom of the sentencing range applicable for a Range I standard offender of a Class A felony.

In *Apprendi v. New Jersey*, the Supreme Court concluded that a trial court may not enhance a defendant's sentence above the statutory maximum unless the facts supporting application of the enhancing factor are submitted to a jury or based on the defendant's prior convictions. *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63, 147 L. Ed. 2d 435 (2000). The *Blakely* court clarified that the relevant "statutory maximum" for sentencing purposes "is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional facts." *Blakely*, 124 S. Ct. at 2537. A panel of this Court has previously concluded that *Blakely* precludes application of enhancement factor (3) because it relies upon the trial court's additional finding that the defendant was a leader in the commission of the offense involving two or more criminal actors. Tenn. Code Ann. § 40-35-114(3). *State v. Greg Harris*, No. E2003-02834-CCA-R3-CD, 2005 WL 419082, *16 (Tenn. Crim. App., at Knoxville, Feb. 23, 2005).

Nonetheless, the trial court sentenced Defendant to the presumptive sentence of twenty years. We respectfully disagree with Defendant's contention that fifteen years is the "presumptive minimum sentence" as contemplated by *Blakely*. The legislature clearly established the midpoint of the range as the presumptive sentence which may be imposed by the trial court without the finding of any additional factors. Tenn. Code Ann. § 40-35-210(c). Although the trial court did consider Defendant's youth in its sentencing determinations, under our statutory sentencing scheme, the trial court may impose a sentence for a Class A felony at the midpoint of the range even if it finds the presence of mitigating factors but no enhancement factors. *Id.* § 40-35-210(d). Defendant's sentence complies with *Blakely* because a twenty-year sentence is the sentence Defendant could have received for his Class A felony conviction based solely on the jury's verdict. Moreover, there is sufficient evidence in the record to establish one enhancement factor based on Defendant's prior conviction in Alabama. Based upon our review of the record as a whole, we cannot conclude that the trial court would have reduced Defendant's sentence below the presumptive sentence of twenty years even had it not considered Defendant's leadership role in the commission of the offense. Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review of the record, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE